[Crim. No. 4036. In Bank.—September 21, 1936.]

THE PEOPLE, Respondent, v. ALBERT WALTER, Jr., Appellant.

Gerald Kenny, Public Defender, and William McDonnell, Assistant Public Defender, for Appellant.

U. S. Webb, Attorney-General, Matthew Brady, District Attorney, and Joseph A. Garry, Assistant District Attorney, for Respondent.

SEAWELL, J.—The defendant was convicted in the Superior Court of the City and County of San Francisco upon an information filed by the district attorney of said city and county against him charging him with having, on June 16, 1936, murdered one Blanche Cousins. The defendant entered a plea of guilty of the offense as charged. Upon arraignment, he expressly refused to enter a plea of not guilty by reason of insanity, but upon the insistence of the public defender, his protest, in these words, "Your Honor, I don't want a plea of insanity," was overruled by the trial court and the plea of not guilty by reason of insanity was ordered in his behalf. The plea of guilty to the charge set forth in the information left but one issue to be determined by the jury which was subsequently empaneled to hear the matter, to wit, the question as to defendant's responsibility to the law for his admitted act. The jury returned its verdict finding him to be sane at the time he did the killing and the court, after taking evidence on the matter, determined that the defendant should suffer the death penalty as punishment for his crime. This being a death penalty case, an appeal was automatically taken without the consent or wish of either the defendant or the attorney who conducted his defense, by reason of the anomalous provisions of section 1239 of the Penal Code, chapter 679, Statutes and Amendments of the Codes, 1935.

The cause came before us at the San Francisco calendar on September 1st of this year for hearing and decision and both sides appeared and submitted the cause without oral argument or the filing of briefs. The public defender by letter notified the clerk of this court in advance of the hearing day that that office was of the opinion that no error had been committed by the trial court and therefore he

would not make an oral argument or file any briefs on the appeal.

Our examination of the entire record presented, including the transcript of testimony and the instructions, confirms the judgment of the public defender.

The issue of insanity was very thoroughly presented by both sides and while there may be no doubt that the defendant is an abnormal person, or, as the psychiatrists classify him, a psychopathic personality, the evidence would not sustain a finding that he was excusable under the law for his act. In fact, the evidence greatly preponderates against him to the effect that he did know and appreciate the nature and quality of the act which he committed and that he knew it was wrong to commit it and that the law imposed punishment for its commission. If he was so far disordered in his mind as to be unable to appreciate what he was doing, or if he knew or appreciated what he was doing, but did not know it was wrong to do the act, and that the law imposed no penalty for its commission in such cases the law would relieve him of the penalties which it ordinarily imposes upon persons who are legally responsible for their acts. Inasmuch as the testimony in general and the opinions of the expert medical witnesses make prominent mention of the symptoms and manifestations of the emotional types and irresistible and uncontrollable impulses and the urges which incite acts which are unquestionable departures from the normal, it seems proper to state the law as it relates to that class of psychosis or abnormalities which are frequently pressed by the defense as affording a valid defense for the accused. It is the well-settled rule of law in this state, which has existed since the early organization of our state government, that moral insanity, as an independent state—that form of insanity in which the patient knows the nature of his act fully but is unable to prevent it, and which is sometimes known as uncontrollable or irresistible impulse—has no standing in this state. Neither will perverted feelings, conscience, affections or sentiments of a defendant bar responsibility for criminal acts unless the intellectual faculties and reasoning power are so affected by mental disease as to render the accused incapable of distinguishing right from wrong in relation to the act under consideration. Of course all abnormalities

or departures from the normal may be considered in reaching a conclusion on the main question, but standing alone they are not sufficient to excuse criminal acts.

The crime is gruesome, the circumstances of its commission are unusual, and the motives which impelled its commission are too recondite to be understood by the average person and can only be accounted for by psychiatrists or criminologists, if at all.

The defendant was born at Worcester, Massachusetts, and was some few months past twenty-eight years of age at the time he committed said crime. His father, Albert Walter, Sr., who resides at Boston, Massachusetts, and Mrs. Angela Walter, the defendant's wife, a resident of New York City, were present at the trial, and it is from the lips of the father and the defendant himself that we record much of the history of the defendant's childhood and early manhood. According to the father's testimony the defendant's mother and himself separated when the son was about three years of age. Two children constituted the issue of the marriage, defendant and his sister, who was a year or more older than he. The mother took the custody of the daughter and the father took the son. The mother, according to Walter, Sr., was a woman of doubtful morals. Soon after the father's divorce from his wife he married for the second time. The boy's career, according to the father, was quite checkered. He made trouble at school, played truant, had a tendency to take property belonging to others and was much given to a nomadic life. At an early age, the father claims, he contracted syphilis, and at about fourteen years of age he practiced homosexual vices and sex perversions. He passed through the grammar grades and had one year at high school. After leaving school he engaged in many occupations and held some responsible positions. Some of his occupations, as told by himself, were: Manager of a chain store; clerk in a lawyer's office at Boston; butler with a private family in New York City; salesman; chef; short order cook; lumberjack; soldier; printer; manager of restaurants. He was connected with the medical corps at Fort Meade, Maryland, United States army service, in 1930–1932. In this service he rose to the rank of sergeant. Twice he deserted, but surrendered himself a short time after his first desertion and as a punishment for the second

he was sentenced to serve one year's imprisonment at Alcatraz. At or about this time he was committed to the Letterman General Hospital, San Francisco. The record at the hospital did not disclose any tests made for venereal diseases. It recorded a denial by him that he was suffering from such a disease. It gave a diagnosis of his mental condition to the effect that he was "known as a constitutional inferiority complex". The report contained the following recommendation: "Not recommended for enrollment in the Disciplinary Battalion because of inferior mental makeup. Constitutional psychopathic inferiority, with nomadic traits . . . " From another report we quote: "Prisoner's intelligence is average. Prisoner's heredity, early environment and training in childhood have been most unfavorable. In consideration of these conditions he has done fairly well in life. ·However, he has considerable character traits, such as undependability and unreliability, restlessness and definite nomadism. This man is wholly unsuitable for. military service because of his nomadic traits. He will not stay in one place any length of time."

It appears that in 1929 the defendant received treatment at the Lincoln Heights Stockade, city of Los Angeles, for gonorrhea. The serological report of the men's venereal ward of that institution showed that a smear for gonorrhea showed positive. He stated that he had had gonorrhea in 1922. After receiving a few treatments at the Central Clinic he disappeared. It was two or three years thereafter that he entered the military service at Fort Meade, deserted and was a patient at the Letterman General Hospital. He was finally dishonorably discharged from the army.

In support of the defense the father testified that the son had suffered two cranial injuries, one of which, he was informed, was in the nature of a fracture. As to the fracture, his testimony was based on hearsay and there is no evidence tending to show that any mental disturbance resulted from said head injuries. The father's testimony indicated that he is of the conviction that the son's weaknesses and abnormalities are congenital, inherited deficiencies. He testified that the defendant's grandmother died an insane person and that his aunt—witness' sister—also was mentally deranged for a time, but was eventually restored to sanity.

As to his wife's branch of the family, defendant's grandfather was an irresponsible individual and committed suicide, the witness testified. He also testified that the mother of the boy was a lascivious person, irresponsible and undependable. That the defendant was nomadic from his adolescent period to the day he arrived in San Francisco on his last journey across the continent is established by an abundance of evidence. He had roamed about the New England states and had gone as far south as Miami, Florida. He had made several visits to San Francisco and had sojourned at San Diego. He seemed to gravitate to seaport cities where, the evidence tends to show, that, at least on one occasion, he consorted with a seaman of his type. He admitted that he had been arrested or detained for identification as a criminal suspect, but there is no evidence in the record that he was ever charged with any major offense. He has held fairly responsible positions at good wages for several consecutive months, and then he has suddenly, and for no apparent reason, disappeared without leave from or word to anyone. At times, after long periods, he would in a penitential strain write to his parents, confess his ill-advised actions and express regret therefor. He had threatened suicide. The father cites incidents which tend to establish the development of sexual perversion beginning with the defendant's adolescent period, and there is no doubt in the minds of the medical experts that his restless and uncontrollable impulse to go from place to place was superinduced by a desire to consort with those who, like himself, were homosexualists. Letters addressed to him and which came to his parents' home in his absence were, in a few instances, opened by them, and there were sufficient suggestions therein to lead to but one conclusion. Homosexuality, according to the medical experts, is an overmastering and overpowering passion which may be subdued for a period of time but often rekindles itself to such intensity as to cause or produce all of the symptoms and disturbances which the evidence shows the defendant to have exhibited. Dr. Eugene W. Mullen, superintendent of the State Hospital at Agnew, accounts for the abnormalities of the defendant on the following theory: "He is not a pure homosexual. He had the homosexual tendencies. He also has heterosexual tendencies, which are normal. There is a certain

conflict between the two conditions. He realizes that it is an abnormal thing to be homosexual, as far as the public looks upon the subject. That has formed a conflict in his own mind. I believe that many of these so-called impulses of traveling have been based upon that fact. The conflict between these two things makes him restless, and he wants to move, or he wishes to move, because he wishes to associate with these people that he knew who were of a like mind.''

The last time that the father saw his son was in March, 1935, at Boston. After a short stay he returned to New York City and wrote a letter to his father, which letter was not produced at the trial, in which, according to his father's testimony, he confessed to a lifetime of misdeeds, recounted all the trouble and diseases he had ever had and admitted to uncontrollable urgings for homosexual contacts with men. He wrote that he had made a terrible mess of life and he saw no escape from these impulses, except by suicide. This letter, the father claimed, was lost. A month later the son wrote a letter which was put in evidence and which we will reproduce. It was written in refutation of reports which he learned had been carried to his parents as to his immoral and improper conduct. The letter shows that he was in a normal frame of mind at the time it was written (about fourteen months prior to the day he committed the crime of which he stands convicted) and it shows that his mind was well organized as to the matters he had in mind. It follows:

"Saturday, April 13, 1935.

"Dear Mother: Why I do these crazy stunts is beyond my comprehension and only after sanity has returned do I realize the consequences of my foolhardiness. So will you please forgive my abrupt and impulsive departure for the idea never occurred to me until after I left the house on Thursday, when in my depressed mood I thought of nothing else other than to be away to try to relieve my mind of the many burdens weighing upon it. I had no malicious intent toward you or anyone. Only the thought that perhaps you had enough troubles without me and that I could work things out for myself. I deeply regret any inconvenience I caused and the subsequent developments which have been the source of any annoyance to you.

"I came directly to New York and by chance happened to run into my former employer who had just returned from Milwaukee or Chicago on money advanced from his firm. It seems his firm had taken him back and assumed obligations of his debts and gave him, out of his salary, only enough on which to live in a small furnished room, paying his debts with the balance. It is true I had some of his personal effects and he agreed, on their return, to pay the balance due me. So now that he has his things back he has told me to go to h— and has written to everyone I know letters which are libelous, slanderous and malicious. Of things he knows nothing about, and information gleaned by opening letters entrusted to him to mail. So whatever has been written to you by him please judge by the character of the letter itself and you will have an idea of the person who writes them. Whatever business relations between us have been settled so there is nothing to warrant any further correspondence to you.

"I read your letter to Mr. Tafte today and could tell from that that some things had been written to you which are false as I am not in any jams with any women anywhere so do not worry about gossip from a malicious tongue. Anyway what business is it of his who I had an affair with. He was only my employer. If he said in a letter that I stole money from a woman please forward it to Mr. Tafte address and I'll file charges of slander and libel. I am not staying with Tafte."

Mrs. Angela Walter, wife of the defendant, testified that she married the defendant in New York on August 24, 1935, approximately ten months before the homicide. She became acquainted with him in April, 1935. She testified that he had a tendency to despondency and did not at all times appear to be normal. He was disinclined to talk. Both the defendant and the wife had employment. One morning in November, three months after marriage, the wife left the husband at home as she went to her place of employment. He seemed very happy and contented. He left that day and she next heard from him a month later, by letter from San Francisco. He wrote that he did not realize what he was doing until he had nearly reached San Francisco. He did not return to her until January, 1936. He told her that he would try hard to overcome his longing to go away, but

he could not promise that it would not happen again. On May 1, 1936, the wife left home to visit her sick mother. It was understood that she would return at the end of the month. Four days before she left to return to New York City she received a night letter from him in which he said that he had been very lonesome and had been anxiously waiting for her to come. back, and asked that she wire him when he could meet her. She wired him, en route home from Boston, but when she arrived home he had gone. He left no word and took with him everything he owned. She did not hear from him or know where he was until after he had killed Blanche Cousins.

At 8:30 on the evening of June 17, 1936, the defendant walked into the bureau of inspectors in the city of San Francisco and inquired for the person in charge. On being told that the inspector was not in, he was asked by Police Officer Alvin Corassa, temporarily in charge, if there was anything he could do for him. The defendant replied, ''Well, I murdered a girl.'' Asked how he murdered her, he said he had choked her to death in an apartment house on California Street, giving the number. Asked by the officer if he had ever been an inmate of an institution, he replied, ''No, I know what I am talking about.'' Asked if he knew that the girl was dead, he replied that he had ''felt her heart and her respiration and her pulse'' and added, ''Isn't that enough?'' He said that he had committed the act at 10:30 o'clock the evening before and had remained at the apartment for an hour thereafter and that, when he left, the body was turning blue. Officer William Stanton joined Officer Corassa and the defendant led the way to the dead girl's three-room apartment. Neither the room nor body had been disturbed. The officers took the pillow from off her head and threw back the bedclothing which concealed the corpse, except the right shoulder, and asked the defendant if that was the girl's body and he replied, ''Yes.'' Asked why he did it, he said, ''Well, I tried to make love to her and she resisted.'' Her silk stocking was tied around her neck and fastened to one of the bed posts. This, he said, was done after he had choked her, which was accomplished while she was on the lounge. He said she had no chance to make an outcry. He stripped her of her clothing, drew the folding bed down, placed her upon it and

violated her person. He did not know whether or not life was extinct at the time he committed the act. He placed her clothing in the closet before leaving. Asked why he gave himself up, he said, ''Well, I am guilty and I want to get it off my chest.'' The defendant appeared to be perfectly normal and answered all questions intelligently, in apt words and without hesitation. He was at the girl's apartment from 7 to 11:30 o'clock P. M. He remained one hour after she died. He then went to his hotel and took a bath. Finding himself restless and unable to sleep, he drank considerable liquor, until exhaustion overcame him. He awakened at 11 o'clock on the morning of June 17th and roamed about the city until he surrendered himself, as heretofore related.

We now turn to a typewritten statement made by the defendant and signed by him on June 17th. So far as mentality may be reflected in a biographical sketch of one's life, it may be said that the statement indicates a well-coordinated and alert mind, with the possible one exception hereafter referred to, far above the ordinary in aptness of expression, and accurate as to memory. He seemed to be well oriented. His statement, much of which may be taken as true, is that he arrived in San Francisco June 3d from New York City, via Greyhound bus line service. His last employment was with Ray's Food Shop, Inc. In 1926 he made his first visit to San Francisco, secured a position and attended Commerce High night school for one year and, since then, has made annual trips to San Francisco. He met Blanche Cousins at Salt Lake City on June 2d. She took passage on the same bus at Salt Lake City en route from Idaho Falls, Idaho, to San Francisco, to enter a training school. She had been a bookkeeper at a hospital in Idaho. She intended to make San Francisco her home. They engaged in general conversation on the way westerly. At Sacramento, he invited her to dine with him. She accepted. He engaged her for dinner on their arrival in San Francisco. He took her to dinner on several evenings after she had changed her lodging place from the Y. W. C. A. to the apartment in which she was murdered. He visited her during almost every evening to the tragic end of her life. On the evening the murder was committed, he arrived at the apartment about seven o'clock and he and the deceased

prepared the meal. Asked if he intended to kill the deceased at the time he started to choke her, he replied that he "thought it a good idea at the time". This is the only inept statement he made. Asked why he thought it a good idea, he said, "revenge, perhaps", for "all the misery I have suffered".

The foregoing tells the story, as narrated by himself, his father and his wife, of a wasted life. To the normal person, untrained in the science of psychosis, there seems to be no explication of his life. It is possible that he may fit into the definition of sadism as given in Medical Jurisprudence, Forensic Medicine and Toxicology, Willhaus & Becker, volume II, page 739. It is there defined: "Sadism is a combination of voluptuousness and cruelty, in which the sexual inclination manifests itself by the desire to beat, to maltreat, humiliate and even kill the person for whom the passion is conceived." Or, it may be that the urge of resentment or for *revenge,* which is a symptom or trait of homosexuality, and which he himself gave as the motive or impulse which actuated the commission of the crime, was the overmastering passion which impelled him to his deed. The above sexual abnormalities are not classified by psychiatrists as insanity. Dr. Eugene W. Mullen, superintendent of the State Hospital at Agnew, who has had a long experience in nervous and mental disorders, testified that homosexuality is an "abnormal state of mind, but it is not insanity". He was of the opinion that the defendant was sane. Dr. Joseph F. Poheim and Dr. Frank Sheehy, both of whom frequently act as medical examiners of persons charged with being insane, as provided by the state law, in and for the city and county of San Francisco, were also of the view that the defendant was sane at the time he took the life of Blanche Cousins. All three of said specialists had given the case painstaking and thorough investigation by personal contact with the defendant and his near relations. Every accessible record which bore upon his condition was studied. Serological and blood tests were made, but there was not found a trace of syphilitic taint or infection. Many hours of investigation, over a period of several days, were devoted to the case, with the result that all of said medical experts were of the opinion that the defendant was sane and that he was fully capable of dis-

tinguishing right from wrong and was conscious it was wrong to commit the act at the time he was perpetrating it. This opinion is corroborated by the conduct of the defendant himself. That his conscience scourged him into surrender and confession is not of itself an indication of insanity.

Dr. Mervin Hirschfeld, a graduate of the University of California and psychiatrist of long experience, was called by the defense and gave testimony of an expert character. He was of the opinion that it was impossible to give a satisfactory or safe opinion as to the defendant's legal responsibility within the period covered by the investigation. He was of the view that a much longer period and a more thorough investigation than had been given to it were required to make a definite mental diagnosis of a case fraught with unusual symptoms and conditions.

The record discloses no evidence that he was inordinately addicted to the use of intoxicating liquors. In fact, the inferences are to the contrary.

We have made a close study of the case because of its baffling features and have come to the conclusion that the defendant is within the rule of responsibility for his act and must suffer the penalty which the law has prescribed. The instructions of the court are in the approved form and no errors appear in the record.

The judgment is affirmed.

Thompson, J., Knight, J., *pro tem.*, Shenk, J., and Waste, C. J., concurred.