[Crim. No. 4691. In Bank. May 7, 1946.]

THE PEOPLE, Respondent, v. OTTO STEPHEN WILSON, Appellant.

Frederic H. Vercoe, Public Defender, and William B. Neeley, Deputy Public Defender, for Appellant.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

SPENCE, J.—Defendant was charged by indictment with the murder of two women, Virgie Lee Griffin and Lillian Johnson, whose bodies were found in the Barclay and Joyce Hotels respectively, in Los Angeles on November 15, 1944. He entered pleas of guilty and of not guilty by reason of insanity to both counts of the indictment. After a jury trial he was found sane at the time he committed both offenses. His motion for a new trial was denied. Each offense was fixed as murder of the first degree and defendant was sentenced to the death penalty on each count of the indictment. This is an automatic appeal under section 1239 of the Penal Code.

The facts and circumstances surrounding the killings as disclosed by the record are as follows:

About November 12, 1944, defendant, who was thirty-four years of age, left his employment at a shipyard near Wilmington, California, and shortly before noon on November 14, 1944, purchased from a hardware store in Los Angeles a knife with about a seven-inch blade. He represented himself as a cook to the salesman who sold him the knife. At 1 p. m. on the same day he secured a room at the Barclay Hotel and signed the register, "Mr. and Mrs. O. S. Wilson, Shelbyville, Indiana." Shortly thereafter, at an unidentified bar, defendant met a partially intoxicated young woman, later identified as Virgie Lee Griffin, with whom he had been theretofore unacquainted. In consideration of $5.00 she accompanied him to his hotel room. Soon after the couple reached the room, defendant went out and got a fifth of whiskey.

After returning to the room he choked the woman and then indulged in an orgy of stabbing, cutting, and severing parts of the woman's body, using the knife he had just purchased. He claimed to have had no sexual experience with her and none was proved. He also claimed that the choking took place during an argument following a demand by the woman for $20 after reaching the room. Defendant stated his original plan was to cut up the body of his victim so as to carry it out of the hotel in package form. To this end one leg was severed, but the plan was then abandoned because of the difficulty of its accomplishment. Instead the several parts of the body were placed in a closet of the room. As defendant was leaving the hotel at about 11 a. m. on November 15, he met the hotel maid in the hall, handed her $1.00 and told her not to go into the room as his wife was tired and he wanted her to rest. At the hotel office he tried to rent the room for another night but was unable to do so. Before leaving the room defendant had attempted to strap the knife to his body with adhesive tape but without success. The knife, empty whiskey bottle, and some wrapping paper were later found in the room.

Shortly thereafter on November 15, defendant picked up a second girl at a bar and went with her to the Joyce Hotel, arriving at about 1:25 p. m. Defendant also gave this woman $5.00. She was later identified as Lillian Johnson. Defendant stated to the hotel operator that his wife was drunk and he wanted a room for two or three hours in order to sober her up. A room was given them and defendant signed the register, "Mr. and Mrs. O. S. Wilson." He proceeded with this second victim in much the same manner as the first except that he used a razor blade instead of a knife. Because of the difference in the implement used, the body of his second victim was not so badly mutilated as the first. About an hour after defendant had entered the hotel, he came to the desk and asked for the room overnight. Upon refusal of his request he stated that he was going down to get his wife some sandwiches. He then left the hotel, went to a picture show, and was later arrested in a bar. As the arresting officer searched defendant, the latter unsuccessfully tried to have the officer throw away a match cover bearing the name "Barclay Hotel." Later at the police station, defendant threw the match cover under a chair.

The police obtained a statement from the defendant which was reduced to writing and then signed by defendant. An addition to this statement made at the time of signing reads as follows: ''I would like to add that I have always been emotionally unstaple (sic) and that with my sexual complex I went completely insane and I could not possibly control myself.'' Defendant denied that he acted under delusions or hallucinations and stated that at no time was he so drunk that he did not know what he was doing.

The background of the defendant, as related by him to the psychiatrists who examined him, is as follows:

Defendant was born in Shelbyville, Indiana, in 1910. He has three or four sisters and two brothers living and he believes them to be responsible people. His father died when he was five years of age, and defendant was then placed in an orphanage. He saw his mother, who had remarried, on only a couple of occasions thereafter, and she died when he was about 12 or 13 years of age. Defendant attended grammar and high school at the orphanage and was graduated at the age of 19. He enlisted in the United States Navy in August, 1930, and advanced to the rank of pharmacist's mate, second class, and was discharged on January 9, 1941. At about 24 or 25 years of age, he began to drink alcoholic beverages but claimed that he did not often drink to excess up to a year or so prior to the time here involved. Defendant did not mix well with people and as a child and as an adult was alone much of the time. As a youth he did a great deal of daydreaming which later changed to fantasies of more adult character. Both in childhood and later his daydreaming was about girls, women, and anatomical characteristics of the body. In recent years certain fantasies of cruelty entered into his daydreams, such as choking a woman, cutting her up, eating parts of her body, and drinking her blood. He claimed that such fantasies were so strong that there was a considerable force to them toward putting them into effect, and he thought seriously of doing so, but always refrained because of a certain control of himself by reason of the consequences. Defendant had no contacts with girls while in the orphanage but his outside contacts and those in later life left him with the impression that girls did not consider and treat him the same as other men and, because of this feeling, he developed a certain bitterness toward them which accentuated his sadistic tendencies.

In 1937, he married a Navy nurse and they separated about three years later when she turned him in to the naval hospital for mental observation. The circumstance which led to her action was his hitting her on the chin and pulling a butcher knife out of his robe, causing her to make her escape through a bathroom window. She charged: "(1) that her husband is a homosexual; (2) that he was 'sexcrazed, insane on the subject, and has suggested that she assist in the sadistic mutilation of a girl by cutting off her breasts and clitoris'; (3) that he has been drinking constantly and to excess; (4) that his actions had been threatening toward her; (5) that he has threatened suicide; (6) that he has been mentally confused on at least two occasions, often moody, depressed, restless, irritable, with definite personality change in the past year."

The statement of the examining neuropsychiatrist at the naval hospital was that there was no obvious psychosis but that the question of sexual psychopathy, homosexuality, and perversion with express sadistic tendencies of a criminal nature was so serious in its implication that prolonged observation and study were necessary. He was discharged on January 9, 1941, as a "C.P.S. Sexual Psychopath. Not recommended for reenlistment." His wife secured a divorce in 1942. After discharge from the Navy, defendant worked in restaurants and as a laborer. He worked at no one place for more than two months. His previous criminal record consists of a conviction of battery (charge changed from attempted rape) and a conviction of second degree burglary, for which he served short jail terms. He has also been arrested two or three times for intoxication. He was on parole at the time he committed the offenses herein considered. Defendant indulged in homosexual practices and had sexual relations with a number of different women over a period of years. He is afflicted with syphilis which was first detected in 1942, but it is not of such an advanced stage as to affect him mentally.

At the trial seven psychiatrists testified upon the issue of defendant's sanity. They based their conclusions upon the facts and circumstances surrounding the killings, the historical background of defendant (both of which were related to the respective doctors by defendant and counsel on both sides substantially as set out above), certain physical and neurological tests and their conversation with and ob-

servation of defendant. Three psychiatrists produced by the defense testified that in their opinion defendant was legally insane when he committed the offenses. On the other hand, the remaining four psychiatrists, two of whom testified that they were appointed by the court, gave as their conclusion that he was a sexual psychopath but was at all times legally sane in the sense that he knew the difference between right and wrong and the nature and consequences of the acts committed by him.

It thus appears that but two questions were presented for determination in the trial court with respect to each count: (1) the question of the degree of the alleged murder to which defendant had entered his plea of guilty and (2) the question of defendant's sanity under his plea of not guilty by reason of insanity.

With respect to the question of the degree of the crimes, the evidence concerning the activities of defendant during the two-day period, including the making of the hotel arrangements, the purchase of the knife, the commission of both offenses in much the same manner, and the making of obvious efforts to delay discovery of the crimes, shows a purposeful, calculating mind, acting with deliberation and premeditation and with a consciousness of guilt, and is sufficient to support the court's fixation of the degree of the murders as first degree. With respect to the question of the sanity of the defendant, the evidence was conflicting but there was abundant evidence given by four of the psychiatrists to support the jury's finding that defendant was sane at the time of the commission of the offenses. The jury impliedly found, upon sufficient evidence and under full and fair instructions, that defendant knew the difference between right and wrong and knew the nature and consequences of the acts committed by him. Under these circumstances, defendant is responsible in the eyes of the law for such acts, regardless of any perversion of his moral senses and regardless of his sadistic tendencies. (*People* v. *French,* 12 Cal.2d 720 [87 P.2d 1014]; *People* v. *Walter,* 7 Cal.2d 438 [60 P.2d 990]; *People* v. *Troche,* 206 Cal. 35 [273 P. 767].)

The judgments and order denying the motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.