[Crim. No. 5542. In Bank. Mar. 19, 1954.]

THE PEOPLE, Respondent, v. CHESTER JACKSON, Appellant.

Jerome Weber, Hy Ginsberg, Theodore Flier and Jess Whitehill for Appellant.

Edmund G. Brown, Attorney General, Norman H. Sokolow, Deputy Attorney General, S. Ernest Roll, District Attorney (Los Angeles), and Robert Wheeler, Deputy District Attorney, for Respondent.

SHENK, J.—This is an appeal from a judgment convicting the defendant of offering to bribe two police officers contrary to the provisions of section 67 of the Penal Code, and from an order denying a motion for a new trial. The bases for the appeal are alleged errors in giving two instructions offered by the prosecution and in refusing an instruction tendered by the defendant.

The defendant had been a member of the Pasadena Police Department for seven years when he resigned in September, 1951, to become a liquor salesman. During the four years prior to his resignation he had been in the Detective Division in the Pawnshop Detail and had frequently worked special details with Officer Bornhoft of the Check and Forgery Detail. A close personal friendship existed between these men and their families. Also in the Detective Division was Officer Thomas, a personal friend of Bornhoft but whom the defendant knew only slightly. None of these men had served on the vice squad of the Pasadena Police Department. On December 6, 1951, Thomas was appointed head of the vice squad. The former members resigned or were shifted to other assignments.

On the evening of December 6, 1951, defendant contacted Bornhoft, who was then on vacation, at his home and asked him how Thomas would take his new job. Bornhoft replied he didn't know as Thomas was a peculiar person to figure out. Defendant then stated that he knew that neither of them believed in the more violent types of crime, such as burglary, robbery and homicide, but they both knew that gambling and bookmaking existed and would continue to exist in the community; that he had learned a lot about it he hadn't known while he was in the department; and that either Thomas would allow these things to go on or he would not remain in charge of the vice squad very long. He told Bornhoft that because of the latter's close friendship with Thomas he (defendant) and other people thought that Bornhoft would be the logical person to contact Thomas and see how he felt about allowing these things to continue. He intimated that if a meeting could be arranged there might be anywhere from $25 to $100 a week in it for Bornhoft. He suggested the following Tuesday night for such a meeting. Bornhoft advised Thomas of this conversation the following day, Sunday, and on Monday when he returned to work he reported the conversation to his superior officer and to the chief of police. He and Thomas were advised by them to go along

with the defendant's proposal, to find out who were behind the whole thing.

On December 11th they met as suggested by defendant, had dinner, and then, again at defendant's suggestion, they drove in his car to a café in Eagle Rock. Bornhoft opened the conversation by stating that Thomas knew why they were there and to get on with the business. Defendant remarked that he knew how they all felt about the more violent type of crimes, but that there had been payoffs to the police department in the past with regard to gambling and bookmaking activities and there were some in the department at that time who felt the same way. He would not answer Thomas' query as to who these men were. He stated that he represented a group of people who wanted to get action (a movement of money in gambling) started, and that Thomas, as head of the vice squad, could make from $100 to $1,000 a week by ''doing nothing.'' When Thomas asked what his duties would be he said that if any complaints came in about telephone places or spots (a place where bets are received by a bookmaking agent) Thomas was to call a certain phone number; that a place would have to operate 6 to 8 weeks in order to pay; and that thereafter if any complaints were received a raid could be arranged with ''fall guys'' (not the real operators) set up to stand arrest and undergo prosecution. Thomas would not give him a definite answer, saying that he had to know more of the details about the risks and reward involved and would have to know everyone who was in on the arrangements. He asked defendant what he knew about the Foothill Charter Club at 10 East Colorado Boulevard, and when defendant countered with the inquiry, ''what did Thomas know,'' Thomas replied that he probably knew more about it than the defendant realized. Thomas testified at the trial that he told defendant how that place was set up and that the reward he would require for allowing such a place to operate would, in view of the risks involved, be $62,500. This sum he arrived at by calculating the amount his salary would bring him for the next 10 years, at the end of which time he expected to retire.

On December 17th defendant saw Bornhoft and inquired as to Thomas' reaction. Bornhoft advised he didn't know and that the defendant would have to ask Thomas. At defendant's request a meeting was arranged for the following night, December 17th. Thomas insisted that Bornhoft also be present and informed defendant that before he would

negotiate any further he would have to be sure that everybody involved was at the meeting. Defendant told him that his proposition was tied into the opening of Santa Anita, which was coming off shortly; that it concerned the opening of five or six phone spots at various places around the city, for which operation Thomas would receive $300 a week, and if these paid well or other operations were opened up, he would receive more. No further duties were required of Bornhoft but he was to receive a weekly sum for his share in arranging the meetings with Thomas. Defendant told Thomas that he didn't know if he could get all the persons involved together for a meeting as Thomas had demanded, but he would try. No further contact was made by defendant with either Bornhoft or Thomas. Several months later an information was filed against the defendant charging him with offering a bribe to Officers Bornhoft and Thomas with the corrupt intent to influence them as police officers. He was subsequently tried before a jury and convicted. A motion for new trial was denied. The defendant was sentenced to state prison for the term prescribed by law, but execution of sentence was suspended and he was granted probation on condition that he serve nine months of the probationary period in the county jail.

At the trial defendant admitted that he had initiated the meetings with Bornhoft and Thomas and had proposed the payoff scheme to them, but he denied that he had any corrupt intent in so doing. His defense was that the proposal was a fictitious one, designed to test the honesty of the officers involved as a part of his plan to apprehend one Wiseman, a bookmaker in Pasadena who he believed was the head of the bookmaking ring there. Wiseman had been a member of the vice squad when one Clint Wright was in charge of it, prior to Thomas' appointment. Defendant testified that he believed that certain members of the vice squad had been accepting payoffs for protecting gambling and bookmaking in Pasadena and that he had determined that if he could prove to himself that the new head of the vice squad, Thomas, was honest he would enlist his aid in apprehending Wiseman and the members of the police department who he believed had been accepting payoffs. He contended that there was no one behind him, that he was not representing any persons or interests, and that the fictitious proposal was entirely his own idea, made for the altruistic purpose of civic betterment.

The defendant attempted to show at the trial that his state

of mind in this matter was influenced by various considerations—including conversations overheard by him while visiting bars in his occupation as liquor salesman, both with regard to bookmaking and payoffs, and particularly with regard to Wiseman's activities; his observations of persons ostensibly making and receiving bets, and his conversations with Wiseman himself. He also attempted to show, as further grounds for his belief that some members of the police department could not be trusted: that valuable properties were owned by certain members of the department which were out of proportion to their monthly salaries; that reports had been made to the vice squad concerning gambling with apparently no official action taken; that the sheriff's office was called in to participate in raids on gambling establishments within the city limits; and that soon after certain raids had taken place the former members of the vice squad had been shifted and Thomas had been appointed as head of the new vice squad. This evidence was admitted by the court for the limited purpose of showing the intent of the defendant and the reasons for his asserted activities.

The court admonished the jury as follows: "Now, ladies and gentlemen of the jury, I should explain this to you: that in admitting evidence of this character, it only goes to the question of the state of mind or the intent of the defendant, and goes to his reasons for his state of mind or his intent at that time. It doesn't establish the truth or falsity of the conversations which he will relate, and it is not necessary, either, for him to prove their truth nor for the People to prove the untruthfulness of them." And, "Now, I should state to the jury that a person may testify directly as to his intention. In other words, as to why he did a certain thing, and that is direct evidence. Witnesses may also testify as to the basis upon which they formed their intention and upon which the witness acted. It does not prove—the testimony of the reason, or relating to the reason that the witness gives for the forming of his intention, or why he acted, does not prove either the truth or falsity of the reasons which he gives, and you must weigh those matters in the light of the testimony that you hear from this stand."

The defendant especially complains of two instructions given at the request of the prosecution on the subject of entrapment and asserts that they relate to rules of law not applicable to the case. He contends that these instructions

tended to confuse the minds of the jurors as to the issues and the evidence, and that they resulted in prejudicial error.

The instructions are as follows:

"No. 851. The law does not tolerate a person, particularly a law enforcement officer, generating in the mind of a person who is innocent of any criminal purpose, the original intent to commit a crime thus entrapping such person into the commission of a crime which he would not have committed or even contemplated but for such inducement; and where a crime is committed as a consequence of such entrapment, no conviction may be had of the person so entrapped as his acts do not constitute a crime.

"If the intent to commit the crime did not originate with the defendant and he was not carrying out his own criminal purpose, but the crime was suggested by another person acting with the purpose of entrapping and causing the arrest of the defendant, then the defendant is not criminally liable for the acts so committed."

"No. 852. When law enforcement officers are informed that a person intends to commit a crime, the law, in the interests of law enforcement and the suppression of crime, permits the officers to afford opportunity for the commission of the offense, and to lend the apparent cooperation of themselves or of a third person for the purpose of detecting the offender. When such a practice is followed by peace officers, if the suspect himself, originally and independently of the officers, intends to commit the acts constituting a crime, and if in pursuit of such intent he personally does every act necessary to constitute a crime on his part, his guilt of the crime thus committed by him is not affected by, and he has no defense in, the fact that when the acts are done by him an officer or other person engaged in detecting crime is present and provides the opportunity, or aids or encourages the commission of the offense."

Under the provisions of section 1093, subdivision 6, of the Penal Code the duty is laid on the judge to charge the jury "on any points of law pertinent to the issue, if requested by either party"; and section 1127 of the same code, as amended in 1935, provides that "In charging the jury the court may instruct the jury regarding the law applicable to the facts of the case . . ." It has long been the law that it is error to charge the jury on abstract principles of law not pertinent to the issues in the case. (*People* v. *Roe* (1922), 189 Cal. 548, 558 [209 P. 560].) The reason for the rule

is obvious. Such an instruction tends to confuse and mislead the jury by injecting into the case matters which the undisputed evidence shows are not involved. ▉ But if the evidence discloses facts pertinent to the case and affecting the substantial rights of a party the court, as above indicated, must instruct the jury with reference to the applicable law when requested by either party and may do so even though no request has been made.

The question then is: Was there evidence in the case which would justify the court in giving the instructions complained of?

▉ Under the doctrine of entrapment, the overt acts essential to the commission of the offense charged are assumed to have been committed by the defendant. But the criminal intent, as here also essential to the completion of the crime, is not assumed to have been established. It is assumed to be lacking when it did not originate in the mind of the defendant but was conceived in the minds of the enforcement officers for the unlawful purpose of inducing him to commit a crime. Here the evidence as to the overt acts committed by the defendant is undisputed. In fact he admitted the commission of them. He also admitted an intention to perform them but sought to avoid any criminal responsibility flowing therefrom by claiming that his intention was to test the honesty and integrity of the incoming head of the vice squad by submitting to him a plan for police protection and discover whether he would or would not agree to it. The question of criminal intention was the only issue at the trial.

▉ The record discloses a factual situation which the attorney general in his brief calls a ''coloration of entrapment.'' Without an instruction on the subject the jury might have applied to the evidence of cooperation and encouragement on the part of the officers a layman's conception of what constitutes entrapment. With this condition of the evidence the prosecution and the trial court deemed it advisable to instruct the jury on the essentials of entrapment which when shown to be present would absolve the defendant of any criminal responsibility; but under the law that cooperation and encouragement on the part of the officers were not enough. It was also necessary to show that the intent to commit the acts which might lead to a criminal prosecution was generated in the minds of the enforcement officers and not in the mind of the defendant.

■ Instruction No. 851 on entrapment is a correct statement of the law on the subject. It was no doubt given on the theory that under the admitted facts the jury might mistakenly consider the conduct of the officers as entrapment even though the criminal intent originated in the mind of the defendant. Viewed in that light the instruction was more favorable to the defendant than he was entitled to. If the jury had returned a verdict of not guilty on the theory of that instruction the prosecution could have no cause to complain for the reason that it had itself offered the instruction.

■ And being more favorable to the defendant than the evidence justified he has no just cause for complaint. (*James v. E. G. Lyons Co.*, 147 Cal. 69, 76 [81 P. 275]; *People v. Lanzit*, 70 Cal.App. 498, 513 [233 P. 816].) Thus instruction No. 851 cannot be said to have misled the jury as to the main issue in the case, namely, whether the defendant had first conceived the intent to commit bribery; nor to have constituted an instruction that the jury was to assume that the original intent was first generated in the mind of the defendant. (See *People v. Chessman*, 38 Cal.2d 166, 182-183 [238 P.2d 1001].)

■ Instruction No. 852 is also a correct pronouncement of the law and its application fits precisely into the facts of this case. There can be no question but that the evidence is sufficient to support the implied finding of the jury that the intention to commit the crime originated in the mind of the defendant and that the conduct of the police officers was within the rule of apparent cooperation which the law permits in the detection and prosecution of crime. The jury was not required to accept as true the defendant's alleged altruistic attitude and rather fantastic claim that his motive in thus planning police protection for gambling operations was to test the integrity of the incoming head of the vice squad of the police department. There was no error in giving either and both of these instructions.

■ The defendant also complains of the refusal of the court to give an instruction tendered by him as to his beliefs concerning payoffs in the police department as furnishing reasons for his proposals to the police officers. As above stated, the jury was admonished during the trial that the defendant's testimony concerning reports and statements brought to his attention as to the existence of bookmaking and protection payoffs in the police department were admitted for the limited purpose of showing his belief and that it

was immaterial whether such reports were true or false if he believed them to be true. These admonitions sufficiently covered the subject matter of the refused instruction. A review of the instructions as a whole demonstrates that the jury was fairly and fully advised as to the necessity of proof beyond a reasonable doubt that the defendant in the first instance had a specific intent wilfully, knowingly and corruptly to influence the officers in question in the performance of their official duties. He was ably represented by counsel and had a full and fair trial free from error.

The judgment and order are affirmed.

Gibson, C. J., Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I concur in the conclusion that the judgment and order denying defendant a new trial must be affirmed. I do not agree, however, that there is *any* evidence in the record which would support an instruction on entrapment. In the majority opinion it is admitted that "[t]he question of criminal intention was the only issue at the trial."

The jury was adequately instructed on the intent necessary to constitute the crime, and under the facts presented it is to be presumed that it found that defendant did possess that intent.

While I feel that there was no evidence to support the instructions given on entrapment, I do not feel that under the evidence presented the instructions could have confused the jury so as to result in any prejudice to defendant. For that reason, I concur in the judgment.

Schauer, J., concurred.