[Crim. No. 9461. First Dist., Div. Three. Jan. 4, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
GERALD ISS WYATT, Defendant and Appellant.

## Counsel

James C. Hooley, Public Defender, and Gary M. Sirbu, Assistant Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Robert R. Granucci and Eugene Kaster, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BROWN (H. C.), Acting P. J.**—This is an appeal from a judgment of conviction of second degree murder after trial by jury.

It is contended that the court erred (1) in refusing instructions relative to unconsciousness of defendant caused by an involuntary compulsion to drink; (2) in refusing to instruct on the defense that he acted under the

reasonable conviction that his life was in danger; (3) in incorrectly instructing on second degree murder; (4) in erroneously denying admission of evidence which would have disclosed his condition in prior specific drinking episodes; (5) in giving an instruction on the defendant's burden in establishing the defense of justifiable homicide, and (6) in refusing admission of a statement given to the district attorney after his arrest.

The victim, Bernice Austin, known as Bernie to her regular customers, was the manager of two taverns frequented by appellant, a heavy drinker. Bernie and appellant were friends. She frequently cashed his checks, and on occasion she would withhold money from his paycheck—with his consent—for safekeeping. On the night of August 30, 1969, Bernie ordered appellant from the tavern known as "Bernie's" because he had in his possession a gun. Appellant returned to the bar later that evening and demanded that Bernie give him certain monies that she had been holding for him. She said that she would give him the money the next day because she did not have the money or a check at the bar. Upon being refused, appellant unbuttoned his shirt, pulled out a .38 caliber Smith and Wesson revolver, cocked the gun, aimed it at Bernie and said, "I want my money *now.*" (Italics added.) Bernie, standing with her hands on her hips, said, "I don't have the money here. You will have to go ahead and shoot." There was a pause of approximately five to seven seconds and then appellant began shooting.

The pathology examination of Bernie's body revealed six bullet wounds causing death. The examination also showed a .23 percent blood alcohol content. The pathologist testified that a person with a high tolerance would not necessarily show that they were under the influence at this level.

Reynolds, the only witness to the killing, jumped at the appellant and the two wrestled to the floor. Appellant hit Reynolds in the head with the gun butt. Reynolds managed to get the gun away and shoved it across the barroom floor. Appellant said, "Please let me go, Dave," in a normal tone of voice and Reynolds released him. Appellant ran out the door.

This version of the shooting was testified to by Reynolds who forcibly disarmed appellant. Appellant's recollection of what happened in Bernie's differed considerably from Reynolds'. He testified that when he walked in the door, Bernie said, "I thought I told you to stay out of here." He had decided at an earlier time to collect some money she owed him since he was going to be transferred, and he thinks he replied that if she paid him his money he would stay out. She replied that she did not have it, and he asked her to write a check.

The conversation continued and Bernie finally said she did not have the checkbook and asked him to return the next day. He replied ."No, you don't want me in here. Just write it now." She said, "I'll just put you out of here," and reached under the counter, got a pistol she kept behind the bar, and started down toward the back of the bar.

The appellant remembers catching a glimpse of the gun. He knew she kept it in the tray under the bar. He had shown her how to operate it and was afraid she would cock it, and she would let it go off and shoot him. He first thought of running, but then he decided he had to make her put it down and started to unbutton his shirt. She approached a little gate to come out from behind the bar.

As the appellant watched Bernie's movements, David Reynolds walked over to him and demanded the gun. The two began to struggle. Appellant jerked loose, scuffled with Reynolds, and then got up and looked for Bernie. She was standing right in front of him looking kind of surprised. He glanced down and saw blood on his clothing and thought that Bernie had shot him. The next thing he recalled was the clicking of the hammer of his gun.

Then he threw the gun down, ran out the door, and ran down the street. He pulled his shirt and T-shirt off, wiped the blood off his chest and stomach and looked for injuries.

Appellant was arrested at approximately 12:50 a.m. when he was seen walking on the street by a police officer who had been given his description. Between this time and the time of the shooting, appellant had gone to the hotel room of an acquaintance and had lain down to take a nap. As appellant sat in the patrol vehicle upon being arrested, he commented that "he was sure sorry about what he had done" and that "she shouldn't have messed around with his money." Then he stated, "I guess I will have to tell the Judge what happened."

Pathologist Alan McNie testified that a blood sample taken from appellant at approximately 3 a.m. on August 31 showed a .21 percent alcohol content. His estimate of the alcohol in appellant's blood at midnight was .25 percent. Doctor McNie also testified that a person who had been using alcohol heavily for a long period of time would probably not suffer as severe an impairment of judgment as a person unaccustomed to alcohol. A very heavy drinker might find his judgment impairment at .25 percent no greater than the judgment impairment of some other person at .10 percent, a figure, however, at which there is always measurable impairment. The fact that a drinker showed less outward manifestation of the alcohol's effect would indicate that his judgment was less impaired.

At the time of the offense, appellant was 39 years of age and had worked as a truck driver for approximately five months. He had begun drinking at the age of 16 and had been a heavy drinker since that time. He enlisted in the Army at age 17 and shortly afterwards became involved in an incident in which he did some drinking, pulled a bayonet off his gun, and began to mutilate himself. Five months later he received a letter of rejection from a girl friend, did some drinking again, cut his leg and nearly slit his throat. He had to be forcibly restrained and was ultimately hospitalized and diagnosed as an alcoholic and manic-depressive. Appellant married in 1951 and his drinking eventually led to the separation of appellant from his wife and children.

During drinking bouts, appellant suffered from hallucinations and a feeling that someone was after him. He had experienced blackouts often, sometimes extending over a considerable period. In the 15 months prior to the offense, he was arrested six times for drunkenness, and in the year prior he had two more hospitalizations. During hospitalization he was diagnosed as an alcoholic and as depressed.

Dr. Blinder, a psychiatrist called by the defense, was of the opinion that appellant was not able to form a specific intent to kill at the time of the shooting and was not able to harbor malice aforethought and not capable of premeditation. He testified that appellant was a chronic alcoholic. He could not state "an arithmetical probability" that appellant could keep "from drinking that first drink" but stated that as an alcoholic appellant had "great difficulty in protecting himself from that first drink." Once having taken the first drink, his ability to stop drinking was "almost non-existent." The psychiatrist also characterized appellant as chronically depressed and as a person whose paranoid tendencies increased with alcohol so that when he shot Bernie he harbored an irrational belief that he was in danger. He illustrated appellant's pathological reaction to alcohol by recounting the above mentioned specific instances of violent, bizarre behavior related to him by appellant, and was also of the opinion that appellant acted unconsciously at the time of the shooting.

Appellant first contends that the jury should have been instructed that he should be acquitted if they found that he killed in a state of unconsciousness brought on by intoxication, involuntary because appellant's alcoholism compelled him to drink.

By statute, California has provided that the following persons are not criminally responsible for their acts: "Persons who committed the act charged without being conscious thereof." (Pen. Code, § 26, subd. Five.) By virtue of Penal Code section 22, however, this exemption from criminal responsibility does not apply to one who is unconscious due to a

state of voluntary intoxication. If the defendant is unconscious at the time of the offense due to voluntary intoxication, his killing is involuntary manslaughter. (*People* v. *Graham,* 71 Cal.2d 303, 316-317 [78 Cal. Rptr. 217, 455 P.2d 153]; *People* v. *Baker,* 42 Cal.2d 550, 575 [268 P.2d 705]; *People* v. *Alexander,* 182 Cal.App.2d 281, 290 [6 Cal.Rptr. 153].)

Intoxication is involuntary "when it is produced in a person without his willing and knowing use of intoxicating liquor, drugs or other substance and without his willing assumption of the risk of possible intoxication." (CALJIC No. 4.24; see also 1 Witkin, Cal. Crimes (1963) § 146, p. 140.) "Intoxication of a person is voluntary if it results from his willing partaking of any intoxicating liquor, drug or other substance when he knows that it is capable of an intoxicating effect or when he willingly assumes the risk of that effect as a possibility." (CALJIC No. 4.22.) The jury, under these instructions, could have concluded that an alcoholic could be involuntarily intoxicated if his compulsion to drink were such as to negate the element of willingness. (See *People* v. *Baker, supra,* at p. 575; *People* v. *Butler,* 205 Cal.App.2d 437 [23 Cal.Rptr. 118].)

Based on the premise that intoxication is involuntary if, due to chronic alcoholism, the defendant is compelled to drink, appellant argues that two additional requested instructions should have been given to the jury tailored to the facts of the case presented, i.e., (1) that when a person commits an act while unconscious due to his involuntary consumption of alcohol, he is not guilty of any offense, and (2) that the jury was to determine whether defendant had the mental power and ability to refrain from taking the first drink, and thereafter lacked the ability to refrain from drinking until he reached a stage of intoxication.

Appellant also argues that the court erred in refusing to give CALJIC No. 4.23, which would have instructed the jury to consider the proof of involuntary intoxication in determining defendant's capacity to commit a crime or to form a criminal intent.

In *People* v. *Conley,* 268 Cal.App.2d 47, 55 [73 Cal.Rptr. 673], the appellant sought similar instructions and the court commented: "Such contentions challenge this court with doctrinal demands not yet voiced by the California Supreme Court. . . ." The court then advised the trial court upon retrial of the case to confine itself to the specific instructions in the earlier case of *People* v. *Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911], which did not include such an instruction. (See also comments in *Powell* v. *Texas,* 392 U.S. 514 [20 L.Ed.2d 1254, 88 S.Ct. 2145] and *People* v. *Wolff,* 61 Cal.2d 795, 814 [40 Cal.Rptr. 271, 394 P.2d 959].)

It is clear that none of the cases mentioned above supports the position taken by appellant, nor, contrary to appellant's claim, does the later case of *People* v. *Mosher,* 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659]. Appellant relies on two sentences of the *Mosher* opinion: "If upon retrial the evidence indicates that defendant was unconscious at the time of the offense due to voluntary intoxication, the trial judge should give this supplemental instruction on involuntary manslaughter. [Citations.] In addition, if upon retrial the evidence indicates that defendant was unconscious at the time of the offense for reasons outside his control, the trial court should render an instruction on unconsciousness. [Citations.]"

This language cannot be interpreted as requiring the trial court to instruct the jury to acquit upon proof of unconsciousness caused by alcoholism.

■ It is clear that appellant could not have secured a more favorable result had the desired instructions been given. As a part of the diminished capacity instructions, the court instructed the jury as follows: "If you find that the defendant killed while unconscious as a result of voluntary intoxication and was, therefore, unable to form a specific intent to kill or harbor malice, his killing is involuntary manslaughter.

". . . . . . . . . . . . . . . . . . .

"Voluntary manslaughter is the intentional and unlawful killing of a human being without malice aforethought. There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion, or if the evidence shows that due to diminished capacity caused by mental illness, mental defect or intoxication, the defendant did not have the capacity to attain the mental state constituting malice aforethought, even though the killing be intentional, voluntary, deliberate, premeditated and unprovoked."

If the jury had believed that at the time of the offense appellant was not conscious because of mental illness, mental defect or any type of intoxication, the jury would not have returned a murder verdict. Thus, failure to give instructions on appellant's definition of involuntary intoxication and theory of unconsciousness could not have resulted in a miscarriage of justice. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

■ Appellant next contends that the jury should have been instructed that if he acted under a mistake of fact due to involuntary intoxication he should be acquitted, and if due to voluntary intoxication, he would be guilty of manslaughter.

Appellant's requested instructions were covered by the instructions given in the self-defense instruction which correctly instructed that a person has a right of self-defense if he acts upon a reasonable and honest conviction of his danger even if the danger is not real but merely apparent. (*People* v. *Jackson,* 233 Cal.App.2d 639 [43 Cal.Rptr. 817]; *People* v. *Collins,* 189 Cal.App.2d 575, 588, [11 Cal.Rptr. 504].)

Appellant's proposed instruction also presents a theory of diminished capacity due to intoxication. The trial court gave the diminished capacity instructions approved by the California Supreme Court in *People* v. *Conley, supra,* 64 Cal.2d at pp. 324-326, which, together with the self-defense instructions, adequately covered the factual situation present in the case.

■ Appellant also complains of the following instruction: "Murder of the second degree is also the unlawful killing of a human being as the direct causal result of an act *involving a high degree of probability that it will result in death, which act is done for a base, anti-social purpose and with wanton disregard for human life.*" (Italics added.)

"When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."

This instruction does not suffer from the same objection as does the instruction given in *People* v. *Ireland,* 70 Cal.2d 522, 538 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], and *People* v. *Wilson,* 1 Cal.3d 431, 437-438 [82 Cal.Rptr. 494, 462 P.2d 22], upon which appellant relies, for it does not relieve the jury of finding the defendant acted with malice aforethought. "When a defendant ' "with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death," ' he acts with malice aforethought." (*People* v. *Conley, supra,* 64 Cal.2d at p. 321.) Thus, under the questioned instruction, the jury would have to find the appellant acted with malice to find him guilty of second degree murder resulting from an act dangerous to life.

■ Further instructions protected the appellant from evisceration of his defense of diminished capacity. The instruction defining murder included this instruction: "The law prohibits acts highly dangerous to human life that cause serious injury or death, unless legal cause or excuse is shown.

"Malice aforethought, either express or implied, is manifested by the doing of such an act by a person who is able to comprehend the prohibition and his obligation to conform to it. There is a presumption that the defendant was able to understand this prohibition, but he may rebut the

presumption by evidence of diminished capacity, on which I shall instruct you shortly."

The court then gave further definitions of malice and of first and second degree murder. Then came the "dangerous act" instruction which is now questioned. Next the court gave instructions on unconsciousness, diminished capacity and manslaughter which included the following: "If you find that the defendant killed while unconscious as a result of voluntary intoxication and was, therefore, unable to form a specific intent to kill or to harbor malice, his killing is involuntary manslaughter."

These instructions make it clear that the diminished capacity defense would apply if the jury had found the "dangerous act" instruction applicable.

■■ Appellant also argues as error an instruction on the defendant's burden in establishing the defense of justifiable homicide and that the court erred in excluding defendant's testimony of specific incidents of drinking and excluding a statement which appellant had given to a deputy district attorney.

The thrust of the entire instruction in which the two sentences on justification for homicide are contained makes it clear that the court was referring to the fact that the jury could acquit the defendant if they had a reasonable doubt on the issue of self-defense.

We have concluded that the jury would be unlikely to take the questionable sentence out of context and be misled on the prosecution's burden of proving every element of the offense beyond a reasonable doubt. The exclusion of the evidence complained of was a proper exercise of the discretionary power to exclude cumulative evidence. The offered testimony was all admitted through the testimony of Dr. Blinder on the only subject to which it was relevant.

The judgment is affirmed.

Caldecott, J., concurred.

A petition for a rehearing was denied February 3, 1972, and appellant's petition for a hearing by the Supreme Court was denied April 12, 1972. Peters, J., and Mosk, J., were of the opinion that the petition should be granted.