[Crim. No. 16502. In Bank. Feb. 7, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
PROSENJIT PODDAR, Defendant and Appellant.

## COUNSEL

Franklin Brockway Gowdy, under appointment by the Supreme Court, for Defendant and Appellant.

James C. Hooley, Public Defender (Alameda), and Gary M. Sirbu, Assistant Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Robert R. Granucci and Karl J. Uebel, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—Defendant was charged by information with the murder of Tatiana (Tanya) Tarasoff. (Pen. Code, § 187.) He pleaded not guilty and not guilty by reason of insanity. A jury returned a verdict of guilty of second degree murder and found defendant sane at the time of the commission of the crime. He was sentenced to state prison for the term prescribed by law.

Defendant's principal complaint on appeal is that the trial court erred in giving implied malice-second degree murder instructions. (CALJIC No. 8.31.)[1] The People contend that the instructions were proper and, even if improper, were not prejudicial. We conclude for reasons stated below that the court erred in refusing to give instructions requested by defendant relating to the effect of diminished capacity to implied malice as an element of second degree murder. Under the facts of this particular case we conclude that in the absence of the error it is reasonably probable that a result more favorable to defendant would have been reached and the judgment, accordingly, must be reversed.

Defendant was born into the Harijan ("untouchable") caste in Bengal, India. He came to the University of California campus at Berkeley as a graduate student in September 1967 and resided at the International House. In the fall of 1968 he attended folk dancing classes at the International House, and it was there he met Tanya. They saw each other weekly throughout the fall, and on New Year's Eve she kissed defendant. He interpreted the act to be a recognition of the existence of a serious relationship. This view was not shared by Tanya who, upon learning of his feelings, told him that she was involved with other men and otherwise indicated that she was not interested in entering into an intimate relationship with him.

As a result of this rebuff defendant underwent a severe emotional crisis. He became depressed and neglected his appearance, his studies and his health. He remained by himself, speaking disjointedly and often weeping. This condition persisted, with steady deterioration, throughout the spring and into the summer of 1969. Defendant did have occasional meetings with Tanya during this period and tape recorded various of their conversations in an attempt to ascertain why she did not love him.

During the summer of 1969 Tanya went to South America. After her

---

[1]All references to "CALJIC" are to California Jury Instructions—Criminal (rev. ed. 1970). Unless otherwise indicated all numbered designations have reference to CALJIC instructions.

departure defendant began to improve, and at the suggestion of a friend sought psychological assistance. In October, after Tanya had returned, defendant stopped seeing his psychologist. The latter then wrote to the campus police alerting them that, in his opinion, defendant was suffering from paranoid schizophrenia, acute and severe. The psychologist recommended that defendant be civilly committed as a dangerous person.

On October 27, 1969, defendant went to Tanya's home to speak with her. She was not at home, and her mother told him to leave. Defendant returned later, armed with a pellet gun and a kitchen knife, and found Tanya alone. She refused to speak with him, and when he persisted, she screamed. At this point defendant shot her with the pellet gun. She ran from the house, was pursued, caught and repeatedly and fatally stabbed by defendant. He then returned to Tanya's home and called the police.

In support of a defense of diminished capacity defendant produced three psychiatrists and one psychologist who testified that defendant was a paranoid schizophrenic who could not have harbored malice aforethought at the time of the killing. The People introduced testimony of a court-appointed psychiatrist who testified that defendant was merely schizoid and could harbor the requisite mental states of first or second degree murder.

The trial court instructed the jury as to several possible findings it might make on the basis of the evidence presented.[2] It read to the jury 8.77, which provides that diminished capacity could negate any of the specific mental states, including malice aforethought, necessary to a finding of murder in the first or second degree.[3]

We are here particularly concerned with those instructions relating to second degree murder. The court instructed on such murder both when malice is express[4] and implied,[5] and gave a further instruction which de-

---

[2]Inter alia; murder in the first degree (8.20), murder in the second degree (8.30, 8.31), voluntary manslaughter (8.40) and involuntary manslaughter (8.45).

[3]8.77 reads in pertinent part: ". . . Also, if you find that . . . [defendant's] mental capacity was diminished to the extent that you have a reasonable doubt whether he did harbor malice aforethought, you cannot find him guilty of murder of either the first or second degree."

The court also instructed in terms of 8.41 and 8.48 that the diminished capacity defense might negate either a finding of voluntary or involuntary manslaughter.

[4]"Murder of the second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation." (8.30.)

[5]"Murder of the second degree is the unlawful killing of a human being as a direct causal result of an act involving a high degree of probability that it will result in death,

fined implied malice in consistent terms.[6] No instruction was given which explicitly related the diminished capacity defense to the implied malice instructions although, as noted, the court instructed generally that malice may be negated by a finding of diminished capacity.

■ Defendant attacks the propriety of giving the implied malice instruction (8.31) in context with related instructions on two grounds: first, the instructions do not preclude the jury from implying malice from a dangerous act which was itself an integral part of the mortal act; and second, the instructions severely weakened the diminished capacity defense in that they failed to advise adequately that a diminished capacity may specifically negate a finding of implied malice.

Defendant's first attack on 8.31 is predicated on the assumption that the second degree murder-implied malice instruction is the functional equivalent of 8.32 in the case of a second degree felony-murder instruction.[7] He argues that 8.31 necessarily, in view of its similarity to 8.32, suffers from the same defect as the latter instruction. We have held 8.32 to be improper where the instruction is based on a felony which is "included *in fact* within the offense charged." (*People* v. *Ireland* (1969) 70 Cal.2d 522, 539 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]; see also *People* v. *Wilson* (1969) 1 Cal.3d 431 [82 Cal.Rptr. 494, 462 P.2d 22].) Defendant contends that where, as here, the act "involving a high degree of probability of death," upon which the implied malice instruction is based (fns. 5, 6, *supra*) is an integral part of the homicide, as is an assault with a deadly weapon resulting in death, then the instruction suffers from a defect similar to that in *Ireland*.

In *Ireland* the defendant shot and killed his wife. The court instructed in terms of second degree felony murder, the purported underlying felony being assault with a deadly weapon. The felony-murder rule allows the implication of malice as an element of murder from the committing of an inherently dangerous felony (*People* v. *Williams* (1965) 63 Cal.2d 452

which act is done for a base antisocial purpose and with wanton disregard for human life.

"When the killing is the direct result of such an act, it is not necessary . . . [to establish intent to cause death]." (8.31.)

[6]"Malice is implied when the killing results from an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life." (8.11.)

[7]"The unlawful killing of a human being . . . which occurs as the direct causal result of the commission of or the attempt to commit a felony inherently dangerous to human life . . . where there was in the mind of the perpetrator the specific intent to commit such crime, is murder in the second degree." (8.32.)

[47 Cal.Rptr. 7, 406 P.2d 647]; *People* v. *Phillips* (1966) 64 Cal.2d 574 [51 Cal.Rptr. 225, 414 P.2d 353]) and, it follows, a finding that such a felony had been committed relieves the trier of fact of having to make the specific finding of malice. (*People* v. *Ireland, supra,* at pp. 538, 539.) We reasoned in *Ireland,* however, that where the felony from which malice was to be implied was an integral part of the homicide itself the net effect was to preclude consideration by the jury of the issue of malice as an element of murder. We held that such a shortcut to a murder conviction was an unwarranted extension of the felony-murder doctrine "beyond any rational function it was designed to serve." (*Id.,* at p. 539, quoting from *People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130].) This was in conformity with our characterization of the felony-murder doctrine as a highly artificial concept of strict criminal liability and as a doctrine to be construed as narrowly as possible in light of its purpose of deterring negligent killings during the perpetration of felonies. (*People* v. *Phillips, supra,* 64 Cal.2d 574; *People* v. *Washington, supra,* 62 Cal.2d 777.)[8]

We turn now to defendant's contention that 8.31 is functionally equivalent to and suffers from the same defect as 8.32. The two instructions are similar in some respects: both focus the jury's attention on an act other than the homicide to find an element necessary for a finding of murder and both are couched in language which defines the operative act with reference to danger to human life.

. There is, however, one crucial and controlling distinction between the two situations governed by the instructions. Under the 8.32 instruction once the intentional commission of the underlying felony has been found no further findings need be made in order to convict of murder. Under the 8.31 instruction, however, the mere finding that the underlying act had been committed is not enough; it must be further found that the act was done for a "base, antisocial purpose with wanton disregard for life" (*supra,* fns. 4, 5)—that is, with malice aforethought—in order to warrant the conviction. Thus even though the implied malice arises out of an act which is an integral part of the homicide, an independent and specific finding of malice, unlike the *Ireland* situation, must nevertheless be made.

The language of 8.31 reflects the statutory standard of implied malice

---

[8]We have continued to adhere to *Ireland* and the policy of narrowly construing the scope of the felony-murder doctrine. (*People* v. *Wilson, supra,* 1 Cal.3d 431; *People* v. *Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847]; *People* v. *Satchell* (1971) 6 Cal.3d 28 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; see also, *People* v. *Wesley* (1970) 10 Cal.App.3d 902 [89 Cal.Rptr. 377]; *People* v. *Butler* (1970) 12 Cal.App.3d 189 [90 Cal.Rptr. 497].)

set out in Penal Code section 188: "[Malice] . . . is implied . . . when the circumstances attending the killing show an abandoned and malignant heart." The phrase "abandoned and malignant heart" has been construed to be that state of mind "[w]here the defendant for a base, antisocial purpose, does an act which involves a high degree of probability that it will result in death" (*People* v. *Thomas* (1953) 41 Cal.2d 470 [261 P.2d 1], Traynor, J. concurring) with wanton disregard for human life (*People* v. *Washington, supra,* 62 Cal.2d at p. 782). When this state of mind has been specifically found to exist then defendant has acted with malice.

Thus it is clear that an instruction in the language of 8.31 does not remove the question of malice from the jury and does not involve the "bootstrapping" condemned in *Ireland*. We conclude, accordingly, that in the absence of other pertinent circumstances (see *infra*), 8.31 properly states the applicable law where the underlying assault is an integral part of the resultant homicide.[9]

Our holding that 8.31 does not suffer from the same defect as that found in 8.32 does not, however, insulate the instruction from attack as being inadequate on the ground that it fails to properly relate the determination of implied malice to evidence of diminished capacity offered to negate the existence of such malice. Defendant contends that 8.31 in conjunction with other given and omitted instructions weakened his diminished capacity defense and resulted in prejudicial error.

Evidence of diminished capacity may negate the existence of a specific mental state essential to the commission of an offense (*People* v. *Conley* (1966) 64 Cal.2d 310, 316 [49 Cal.Rptr. 815, 411 P.2d 911]), including the existence of malice aforethought (*People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53]). The use of such evidence is relevant to both the question of whether the offense was murder in the first or second degree (*id.*) and the question of whether the offense was murder or manslaughter (*People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492]; *People* v. *Henderson* (1963) 60 Cal.2d 482 [35 Cal.Rptr. 77, 386 P.2d

---

[9]Our holding has been prefaced by three Court of Appeal cases: *People* v. *Wyatt* (1972) 22 Cal.App.3d 671 [99 Cal.Rptr. 674], *People* v. *Roy* (1971) 18 Cal.App.3d 537 [95 Cal.Rptr. 884], and *People* v. *Goodman* (1970) 8 Cal.App.3d 705 [87 Cal. Rptr. 665] (disapproved on other grounds in *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1]). In *Wyatt* 8.31 was given where the defendant assaulted the deceased with a deadly weapon (pistol). The court held 8.31 proper and *Ireland* inapplicable as the question of malice was not removed from the jury (accord, *People* v. *Goodman, supra,* assault with a shotgun). In *Roy* both 8.31 *and* 8.32 were given where defendant assaulted the deceased with a deadly weapon (pistol). The court held that 8.31 did not violate *Ireland,* and that the giving of 8.32 was not prejudicial error in that the case was not argued or tried on the felony-murder theory.

677]). ■ In short, in any situation where malice aforethought or any other specific mental state must be established in order to find a charged or included offense, evidence of diminished capacity may be used to negate its existence. When such evidence exists the accused is entitled to an instruction which clearly indicates the full effect which a finding of its existence may bear on a crucial mental element of the charged and included offenses. (*People* v. *Mosher* (1969) 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Castillo* (1969) 70 Cal.2d 264 [74 Cal.Rptr. 385, 449 P.2d 449].)[10]

Our inquiry in the instant case is particularly directed to the propriety of the jury's finding of implied malice in light of the evidence of diminished capacity.[11] As noted above, malice is implied from a finding, inter alia, that an accused acted with "wanton disregard for human life." (*People* v. *Washington, supra,* 62 Cal.2d at p. 782.) ■ In order to find "wanton disregard" it must be shown that the accused was both aware of his duty to act within the law and acted in a manner likely to cause death or serious injury despite such awareness. (*People* v. *Conley, supra,* 64 Cal.2d 310, 322.) The effect, accordingly, which a diminished capacity bears on malice in a second degree murder-implied malice case is relevant to two questions: First, was the accused because of a diminished capacity unaware of a duty to act within the law? A person is, of course, presumed to know the law which prohibits injuring another. Second, even assuming that the accused was aware of this duty to act within the law, was he, because of a diminished capacity, unable to act in accordance with that duty? (See *People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Noah* (1971) 5 Cal.3d 469, 478 [96 Cal.Rptr. 441, 487 P.2d 1009].)[12] If it is established that an accused, because he suffered a diminished capacity, was unaware of or unable to act in accordance with the law, malice could not properly be found and the maximum offense for which he could be convicted would be voluntary manslaughter.

■ The record discloses in the instant case that there was significant evidence of defendant's diminished capacity. Almost all of that evidence

---

[10]The failure to so instruct is no longer per se reversible error. (See *People* v. *Sedeno* (1974) *ante,* page 703 [112 Cal.Rptr. 1, 518 P.2d 913].)

[11]The record discloses no compelling evidence of express malice and we must presume that the verdict of second degree murder could have been based on a finding of implied malice. The verdict, accordingly, must be justified, if at all, on the propriety of such a finding.

[12]We in no way imply a change in the previous rule that irresistible impulse is not a complete defense to a crime. (See *People* v. *Gorshen, supra,* 51 Cal.2d 716, 726; *People* v. *Walter* (1936) 7 Cal.2d 438 [60 P.2d 992].) Evidence of irresistible impulse here acts as a partial defense if it effectively negates the existence of malice.

was focused on the question of whether the defendant knew of the duty which society imposed upon him and could act in accordance therewith.[13] The question of the existence of a diminished capacity was clearly a disputed factual issue and defendant was entitled to have the jury instructed on its applicability to the issue of implied malice. The failure to give instructions thereon would thus have been error. As the court did give some instructions as to the effect of a finding of diminished capacity, the next inquiry is whether such instructions adequately related diminished capacity to implied malice.

As noted, the court instructed on second degree murder grounded, inter alia, on implied malice. An instruction was also given that if the jurors found diminished capacity to the extent that they had reasonable doubt whether defendant harbored malice aforethought they could not find defendant guilty of second degree murder. (8.77, fn. 3, *supra.*)

We do not dispute that, to the extent the jurors were advised by the court, the instructions were legally correct and accurate. The vice of the instructions, however, is that they stopped short of being full and complete and failed to advise as to the precise finding or findings, after a threshold finding of a diminished capacity, which must be made prior to a determination that defendant acted with malice aforethought.

Malice is properly implied when a killing resulting from an act involving a high degree of probability of death is accompanied by the requisite mental element. The process properly leading to a finding of that element requires three specific determinations. First, was the act or acts done for

---

[13]Dr. Kermit Gruberg, a psychiatrist employed by the Berkeley Police Department, testified for the defense that he had examined defendant within 24 hours of the killing. In his opinion defendant suffered from paranoid schizophrenia and was not capable of "mature and meaningful" reflection on the nature of his act in killing the deceased. The doctor further testified that the defendant's understanding of the duty placed upon him by the law was severely impaired by his illness. Dr. Stuart Gold, a defense psychiatrist, testified that he had occasion to examine defendant when defendant sought psychiatric aid from the student health clinic. In his opinion defendant was a paranoid schizophrenic who, because of his psychotic delusions about the deceased, could not have understood ". . . what he was doing and what he was thinking about in terms of taking her life." Dr. Philip A. Grossi, a defense psychiatrist, had examined defendant extensively. He also testified that the defendant was a paranoid schizophrenic who lacked the capacity to understand the duty that the law placed upon him not to kill another person. Dr. Lawrence Moore, a psychologist at the university, gave substantially identical testimony as in the case of the three psychiatrists called by the defense. Dr. Wilmer M. Anderson, a neurologist called by the defense, testified that on the basis of neurological tests, including an electroencephalogram, there were organic abnormalities in defendant's brain. Dr. John Peschau, a psychiatrist appointed by the court, testified that defendant was not a paranoid schizophrenic and that he could understand the duty that the law placed upon him.

a base, antisocial purpose? Second, was the accused aware of the duty imposed upon him not to commit acts which involve the risk of grave injury or death? Third, if so, did he act despite that awareness? The first determination is expressly required in accordance with the definition of implied malice, and the second and third determinations are required relative to the question of "wanton disregard" also in accordance with the definition of implied malice. (8.11, fn. 6, *supra*.) In order to make a proper finding of malice aforethought all three of the foregoing inquiries must be answered in the affirmative and as to *each* inquiry evidence of a diminished capacity must be weighed in the balance. The jurors in the instant case were told only that diminished capacity could negate implied malice without being advised that such defense could negate each essential element which must be found prior to the finding of implied malice.

Although we are of the view that ideally an instruction or instructions should have been given making the evidence of diminished capacity specifically applicable to each of the three elements of the mental state determination, we do not deem it error to have instructed only generally in the absence of a request for the more specific instructions. (See *People* v. *Wilson* (1967) 66 Cal.2d 749 [59 Cal.Rptr. 156, 427 P.2d 820]; *People* v. *Wade* (1959) 53 Cal.2d 322 [1 Cal.Rptr. 683, 348 P.2d 116].) Moreover, as to the first determination, whether the act or acts were done for a base, antisocial purpose, the instructions might well be deemed specifically sufficient as the jurors were twice expressly instructed that this was an element of implied malice (8.31, 8.11, fns. 5, 6, *supra*), and that they must consider evidence of diminished capacity in finding implied malice.

The record does not disclose that defendant requested an instruction specifically relating to the applicability of evidence of diminished capacity to the first determination. He did, however, request such instructions as to the second and third determinations. He proposed two instructions based on *People* v. *Conley, supra,* 64 Cal.2d 310, 324-325, which spoke in terms of the duty which the law imposed and a person's ability to conform his conduct to that comprehended duty. The court, however, refused to give these or similar instructions. Furthermore, the jurors were not advised that "wanton disregard," as an element of implied malice, consisted of an awareness of a duty imposed by law followed by the commission of the proscribed act despite that awareness. At no time were they specifically told that the evidence of diminished capacity was directly applicable to the questions of whether defendant was both aware that he must act within the law, and that he acted despite such awareness. The resolution of these issues, moreover, involved the focus and thrust of defendant's voluminous evidence of diminished capacity. The instructions as given thus failed to

serve the needs of the jurors to understand and properly apply the evidence of diminished capacity to the underlying issues. The result was the jury could have found malice without giving proper weight to evidence presented in support of a crucial defense, and the court erred by its refusal to instruct in more specific terms. (*People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].)

We have little difficulty in concluding that the error was prejudicial. Defendant's whole defense was, essentially, his failure to have entertained mental intents which were necessary elements of the crimes charged or included in the charges. Evidence was introduced which was almost overwhelming that by reason of diminished capacity defendant lacked malice aforethought. Under the facts of the instant case we conclude that in the absence of the error it is reasonably probable that a result more favorable to defendant would have been reached. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

As the foregoing prejudicial error requires that the judgment be reversed and the cause be remanded for retrial it is not necessary that we resolve defendant's remaining contentions. We deem it proper to comment, however, for the guidance of the parties and the court in the event of a retrial, as to defendant's contention that the court prejudicially erred in giving instructions on voluntary manslaughter based on sudden quarrel or heat of passion. (8.41, 8.42, 8.43, 8.44.)

Defendant contends that the record fails to support any possible finding of manslaughter based on statutory mitigating circumstances (Pen. Code, § 192), and that because the instructions specifically directed the jurors to measure defendant's conduct against an objective standard, they prejudicially conflicted with instructions on diminished capacity requiring that defendant be judged subjectively.

We agree that on the record of this appeal there is no sufficient evidence that defendant's conduct was the result of a sudden quarrel or heat of passion and, in the absence of a request by defendant for an instruction thereon, it was error to so instruct. (See *People* v. *Jackson* (1954) 42 Cal.2d 540 [268 P.2d 6]; *People* v. *Nunez* (1970) 7 Cal.App.3d 655 [86 Cal.Rptr. 707].) We do not intend to imply that on a different showing on retrial defendant is precluded from asserting such a defense. He would in that event be entitled to proper instructions thereon.

The judgment is reversed.

Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

**DRAPER, J.**\*—I dissent.

The instructions given adequately informed the jury of the scope of the defense of diminished capacity. The jury was informed that "there is no malice aforethought if the . . . evidence shows that due to diminished capacity caused by mental illness (or) mental defect . . . the defendant did not have the capacity to attain the mental state constituting malice aforethought even though the killing be intentional, voluntary, premeditated and unprovoked." The court also defined involuntary manslaughter as "the unlawful killing of a human being without malice and without an intent to kill . . . . There is no malice aforethought or intent to kill if by reason of diminished capacity . . . the defendant did not have the mental capacity to harbor malice aforethought and to form an intent to kill."

In light of these instructions, I cannot believe the jury would be misled by the instruction implying malice if the killing is "the direct causal result of an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life." Clearly, the "base antisocial purpose" and the "wanton disregard for human life" relate solely to the state of mind of the defendant. Yet, if adequate diminution of capacity had been determined, defendant could hardly have a "purpose," much less one which was "base and antisocial," nor could his disregard for human life be "wanton."

The majority opinion does not set out the instructions requested by defendant. As I read them, the strongest states only that malice may be implied as the court in fact instructed, merely inserting in the definition of the act of violence the phrase "committed by a person who is able to comprehend that the law prohibits such an act and who is able to comprehend his obligation to conform his conduct to such prohibition." This request does not reach the three-step refinement proposed by the majority, nor does it add anything of significance to the instructions actually given. There is no instruction upon any subject which cannot be refined or modified to expand upon its qualifications and ramifications to the taste of some scholar of the law. Instructions, however, are not designed to give a detailed law course, but to instruct 12 laymen, in lay language, as to the fact issues they are to determine. Expansion upon them, and development of their detailed application to the facts in issue, fall properly within the field of argument by counsel, rather than instruction by the court.

\*Assigned by the Chairman of the Judicial Council.

Reversal for misdirection of the jury may be made only if the error complained of has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) I cannot find such a miscarriage. The issue the majority finds determinative is raised by appellant but peripherally to his contention that the instruction given (CALJIC No. 8.31) suffers from the defect found in 8.32 (*People* v. *Ireland,* 70 Cal.2d 522, 539 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]), a contention which the majority rejects. Moreover, appellant himself did not find prejudice in the denial of a new trial. The Court of Appeal, First District, Division Four, reduced the conviction to one of manslaughter. The Attorney General petitioned for hearing in this court, and appellant's opposition stated that the Court of Appeal decision "is a just and sound one." Nevertheless, this court now remands the issue for new trial.

The reversal will require extended trial time—some 17 days were consumed in the present trial on the plea of not guilty. Moreover, it will require reversal of an untold number of cases already tried and now pending on appeal. Upon retrial of all those cases, the absence of a definitive instruction in the majority opinion predictably will lead to varying language choices by the several trial courts in seeking to meet the requirements of the majority holding, thus leading to diversity of opinion and still further decisions by this court to settle what language precisely meets the technical semantic standards here espoused. Of course, this burden would be readily shouldered if prejudice appeared. As pointed out above, I cannot find such prejudice here.

I would, at most, reduce the conviction to one of manslaughter, and as so reduced, affirm the conviction.

McComb, J., concurred.

Respondent's petition for a rehearing was denied March 13, 1974. McComb, J., and Clark, J., were of the opinion that the petition should be granted.