Filed 8/26/21  P. v. Solis CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B305541 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA434593) |
| v. | |
| HENRY SOLIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Robert J. Perry, Judge.  Affirmed.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Roberta L. Davis and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Henry Solis of second degree murder after he fatally shot Salome Rodriguez outside a nightclub. Solis was a police officer, but he was not on duty at the time. At trial, Solis testified that Rodriguez and another man robbed and sexually assaulted him earlier that night. According to Solis, he killed Rodriguez while trying to arrest him for those crimes. On appeal, Solis contends the trial court made several instructional errors and the prosecutor engaged in misconduct. He also asserts his counsel provided ineffective assistance for failing to request certain jury instructions and failing to object to the imposition of fines and fees. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Solis was charged by information with the first degree murder of Salome Rodriguez. (Pen. Code, § 187, subd. (a).)[1] It was further alleged that he personally and intentionally discharged a firearm causing great bodily injury and death. (§ 12022.53, subd. (d).)[2]

***Prosecution Evidence***

The case was tried to a jury, and the prosecution presented evidence showing the following.

The evening of March 12, 2015, Rodriguez and his coworker, Gene Garcia, drove to the Carnaval nightclub in downtown Pomona. Inside the club, Rodriguez met Monique Ortiz, who was working as a dancer. Rodriguez danced with Ortiz and her friends throughout the night.

---

[1]    All undesignated statutory references are to the Penal Code.

[2]    The information also alleged Solis committed assault with a firearm, but the court granted the People's motion to dismiss the count during trial.

2

Around 1:45 or 2:00 a.m., Rodriguez, Ortiz, and her friends left the club and went to a pizza place located in the same building. Rodriguez and Ortiz were flirting with each other. They stayed at the pizza place for about 30 or 40 minutes.

Rodriguez walked Ortiz's friend to her car before meeting up with Garcia, who was waiting outside Carnaval. Garcia drove them to a nearby parking lot and fell asleep. At some point Rodriguez got out of the car and started walking toward the pizza place, possibly to look for his missing wallet.

Around this time, Solis was standing outside the Vive nightclub, which was located in the same building as the pizza place and Carnaval. Vive was an after-hours club, which generally stayed open until 3:00 a.m.

Yerezmin Martinez, who was also standing outside Vive, thought Solis looked "dozed out," and she asked if he was okay. They had a brief conversation, during which Solis said he had served in the military. Solis's personality alternated between bubbly and aggressive. At one point, he put his hand near his back, around his waistline. Martinez felt "weird" and decided to end the conversation.

A few moments later, Martinez saw Solis and Rodriguez running and shoving each other. It looked like Rodriguez was trying to get away. Solis pressed Rodriguez up against a car with one hand while holding a gun in his other hand. He pointed the gun at Rodriguez's forehead, between his eyes. Solis and Rodriguez pushed off one another, and they started running. Martinez lost sight of them at that point.

Dennis Kuntz, who lived in the area, was asleep and woke up to the sound of two men arguing. He heard one man say "why would you do that," and another man fearfully respond, "I

3

wouldn't do that" or "I didn't do that."  The second man then repeatedly said "no" in an incredibly fearful tone.  Moments later, Kuntz heard four gunshots.

Christopher Romero was collecting cans near Vive when he saw Solis cross the street and start talking to Rodriguez.  It sounded like they were arguing, and Rodriguez seemed to be trying to get away from Solis.  Solis pushed Rodriguez with both hands.  Rodriguez started walking away, and Solis followed him.  Both men stopped walking and got in each other's face.  Rodriguez swung his fist at Solis.  A few minutes later, Solis— who was standing—shot Rodriguez four times.  Rodriguez started running away, but he eventually collapsed.

A security guard found Rodriguez lying face down next to Garcia's car.  Rodriguez suffered gunshot wounds to the neck, abdomen, and thigh.  He also suffered abrasions and scrapes to one of his knees.  Rodriguez was transported to a hospital and underwent surgery, but he eventually died from his wounds.  The coroner opined that one of the thigh wounds was fatal.

After shooting Rodriguez, Solis had his roommate, Laura Rosales, pick him up in downtown Pomona.  Solis told Rosales he had "fucked up," killed somebody, and was going to kill himself.  Solis quickly remarked that he was just kidding.  Later, he told Rosales, "you're never going to see me again."  Solis also told Rosales he was going to throw away his shirt.  Rosales later found the shirt partially tucked into the rear bumper of her car.

Around 5:00 a.m. on March 13, Solis hired a taxi to drive him around downtown Pomona, apparently to look for his car.  They searched unsuccessfully for 45 minutes.  Solis told the driver he had been in the Marines, and he was unhappy with how

4

military veterans are treated.  He said his friend recently committed suicide.

Solis was photographed entering Mexico in the early morning of March 14.  That same day, he called Rosales, asking if anyone was looking for him.  He told her not to tell the police anything.  With the help of U.S. federal agents, Mexican officials located Solis in Juarez and took him into custody on May 26, 2015.  He was extradited to the United States.

A fully-loaded magazine for a Glock 42 firearm was discovered near where Rodriguez was shot.  Police subsequently found in Solis's room a receipt for the purchase of a Glock 42 firearm and two magazines.  The bullets recovered from Rodriguez's body, however, had been fired from a different type of gun.  Solis received such a gun as a gift from his uncle.

Police discovered Solis's car parked a few blocks from Vive.  Inside the car, officers found handcuffs and a police service firearm loaded with a 17-round magazine.  They also found a pass for a parking lot much closer to the nightclub.  The pass was purchased the night of the shooting and was valid for 15 hours.

The prosecution's crime reconstruction expert opined that Rodriguez was shot first in the neck while standing and bent slightly forward.  The second shot was to the abdomen, while he was turned away from the muzzle of the gun.  The final two shots, which struck Rodriguez in the thigh, occurred while he was on the ground and on his knees.

### Defense Evidence

Solis testified in his own defense.  According to Solis, after serving in the military, he applied to be an officer in the Los Angeles Police Department.  He eventually graduated from the

5

academy and was assigned to the Devonshire station as a patrol officer.

Solis went to Vive around midnight on March 12. He carried an unholstered Glock 42 handgun in his back pocket.

Solis was sitting at the bar when Rodriguez walked up to him and asked if he was a Norteño gang member. Solis said he was not and did not mean to offend anyone. He then bought drinks for Rodriguez and another man with him.

Solis told Rodriguez he worked for his aunt's interior design business. Rodriguez asked Solis if he was gay, and Solis responded, "Yes. I'm gay. I'm bi." The man who was with Rodriguez remarked, "You're going to have to sleep with him for that drink."

Solis finished his drink and went to the restroom, which was empty. He walked into the handicap stall and began to urinate. Solis heard footsteps and then someone struck him on the back of the head. He started to lose consciousness and ended up on his knees, pressed against the toilet. Solis turned around and saw Rodriguez pointing a gun at him. Solis felt someone searching his pants and then pull down his boxers. Solis screamed and unsuccessfully tried to get away.

Rodriguez remarked that this was his turf, Solis was a Norteño, and Rodriguez was going to kill him if he saw him again. Solis felt a hard object being pushed up his rectum and he screamed. Rodriguez and the other person ran away. Solis pulled a beer bottle out of his rectum. He was in considerable pain, and noticed his wallet and gun were missing.

Solis left the bathroom and asked if anyone had seen Rodriguez, but no one had. He left the club and walked around. He did not want to call the police because he was embarrassed

6

and could not provide a helpful description of his attackers.  He was also concerned they might run off if they heard police sirens.

Solis went to his car and retrieved a single pair of handcuffs and a five-shot revolver.  He drove the car around the area looking for Rodriguez.  He was dizzy, so he decided to park and walk around on foot.  He then returned to Vive to see if there were security cameras that captured the assault.

Solis was talking to Yerezmin Martinez outside Vive when he saw Rodriguez pass by.  Solis followed him.  Rodriguez eventually noticed Solis and asked him, "what the fuck are you doing here?"  Solis told him, "I'm a Los Angeles Police Officer, and you're under arrest for assault and robbery."  Rodriguez told him to "fuck off" and walked away.  Solis pulled out his police badge, but Rodriguez continued to ignore him.

Solis circled in front of Rodriguez, took out his revolver, and again told Rodriguez he was under arrest.  Rodriguez started walking toward a car.  Solis sprinted after him, pushed him up against the car, and started patting him down.  Rodriguez pushed him away.

Solis asked "where's the gun?"  Rodriguez pulled out the Glock 42 and threw it underneath a car.  The magazine popped out, and Solis kicked it away.  Solis screamed, "someone please call the police."  He heard a man respond, "I'm calling the police," and "the police are on their way."

Rodriguez offered to take Solis to his friend, who he claimed was responsible for the sexual assault.  Solis refused and told Rodriguez to wait until the police arrived.  Rodriguez instead walked away, and Solis followed him.  Solis repeatedly demanded Rodriguez stop walking and said he would shoot if Rodriguez reached for anything.

Solis pulled his cellphone out of his pocket with his right hand while holding the revolver in his left hand. At that point, Rodriguez approached Solis and tried to punch him. Rodriguez then grabbed Solis's left hand and attempted to take the revolver. Solis switched the revolver to his right hand, and Rodriguez tried to grab his right arm. Solis aimed the revolver at Rodriguez's leg and fired. He did not want to kill Rodriguez.

Rodriguez "bull rushed" Solis, who pulled the trigger a second time. Solis fell to the ground on his back. Rodriguez, still standing, moved to the left side of Solis's body and lifted his leg, preparing to stomp Solis in the head. Solis feared for his life, thinking the kick would either kill him or he would lose his weapon and Rodriguez would shoot him. When asked at trial why he was afraid, Solis responded, "I don't think I have the words. I was afraid."

Solis quickly fired two shots toward Rodriguez's leg. Rodriguez turned and ran away. Solis got up and ran the other direction.

Solis did not stay at the scene because he was ashamed and embarrassed. He was concerned that he would be treated as a pariah because of the anti-police rhetoric at the time. He also did not think the police would believe him, so he decided to flee to Mexico.

In addition to Solis's testimony, the defense presented evidence that Rodriguez told someone in the pizza place that he planned to go to Vive later that night. The defense also presented testimony from a crime reconstruction expert who opined it was impossible to tell with certainty what position Rodriguez was in when he was shot in the thigh. The expert

could not rule out the possibility that Solis was on the ground shooting up at Rodriguez.

*Verdict and Sentence*

The jury convicted Solis of second degree murder and found true the firearm enhancement. The court sentenced him to 15 years to life for the murder, plus a consecutive 25 years to life for the firearm enhancement. The court imposed various fines and fees without objection. Solis appealed.

## DISCUSSION

## I. Defense Counsel Did Not Provide Ineffective Assistance by Failing to Request Jury Instructions on Antecedent Threats/Harm

Solis contends his counsel rendered ineffective assistance by failing to request the jury be instructed they could consider Rodriguez's alleged assault when determining whether Solis acted in self-defense. We disagree.

The trial court instructed the jury with CALCRIM Nos. 505 and 571, which concern perfect and imperfect self-defense. Both instructions informed the jury that self-defense has a subjective component: the defendant must actually believe (1) he was in imminent danger of being killed or suffering great bodily injury, and (2) the immediate use of deadly force was necessary to defend against the danger. The instructions also informed the jury that perfect self-defense has an objective component: the defendant's beliefs must be reasonable. The instructions told the jurors to "consider all the circumstances" as they were known and appeared to the defendant when evaluating his beliefs.

Among the circumstances a jury may consider when evaluating a defendant's beliefs are prior threats or assaults by the victim, which are often referred to as antecedent

9

threats/harm. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065.) The model CALCRIM instructions on self-defense include optional language regarding antecedent threats/harm. The optional language in CALCRIM No. 505, for example, states: "If you find that [the decedent] threatened or harmed the defendant [or others] in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable." The optional language in CALCRIM No. 571 similarly states: "If you find that [the decedent] threatened or harmed the defendant [or others] in the past, you may consider that information in evaluating the defendant's beliefs." The trial court did not instruct the jury with this optional language; nor did defense counsel request such instructions.

As Solis concedes, the trial court did not have a sua sponte duty to instruct the jury with the optional antecedent threats/harm language. (See *People v. Garvin* (2003) 110 Cal.App.4th 484, 489.) This is because the standard CALCRIM instructions on self-defense are legally correct, and the concept of antecedent threats/harm is fully consistent with the general principles expressed in them. As a result, an instruction on antecedent threats/harm is essentially a clarifying instruction, which must be given only if requested by a party. (*Ibid.*)

Aware of this authority, Solis contends his counsel rendered ineffective assistance by failing to request the clarifying instructions, which were necessary to allow the jurors to connect the prior assault with his state of mind and the objective reasonableness of his fear. To prevail on a claim of ineffective assistance of counsel, a defendant must establish two elements: (1) counsel's representation fell below an objective standard of

10

reasonableness; and (2) there is a reasonable probability that, but for counsel's errors or omissions, a determination more favorable to the defendant would have resulted. (*Strickland v. Washington* (1984) 466 U.S. 668, 690, 694; see *People v. Holt* (1997) 15 Cal.4th 619, 703.)

We need not decide whether counsel's failure to request the clarifying instructions fell below an objective standard of reasonableness because there is no reasonable probability that, had the court given the instructions, a determination more favorable to Solis would have resulted.

The issue of self-defense did not turn on a dispute over Solis's beliefs. Rather, it essentially came down to which version of events the jurors believed. If they believed Solis's testimony that Rodriguez resisted arrest, reached for his gun, tackled him, and then prepared to stomp on his head, it is inconceivable that they would have concluded Solis did not reasonably fear for his life and believe the use of deadly force was necessary. This is true even without factoring in the effect of the alleged prior assault. If, on the other hand, the jurors believed the prosecution's theory that Solis shot Rodriguez while on his knees, there is little doubt they would have found Solis did not reasonably fear for his life or believe deadly force was necessary. Both defense counsel and the prosecution seemed to recognize this, as neither spent significant time challenging or bolstering Solis's beliefs, either while examining him or during their closing arguments. Instead, both focused on which version of events was true. The antecedent threats/harm instructions would not have assisted the jurors in making that determination.

In any event, the jury was instructed to consider "all the circumstances" as they were known and appeared to Solis when

11

evaluating his beliefs. Given Solis's testimony that the alleged assault occurred in close proximity to, and was the motivating force behind, the subsequent deadly confrontation, there is little doubt the jurors would have considered it when determining whether he actually and reasonably feared for his life and believed the use of deadly force was necessary. (See *People v. Gonzales* (1992) 8 Cal.App.4th 1658, 1665 ["The concept [of antecedent harm] is closer to rough and ready common sense than abstract legal principle."].) As a result, there is no reasonable probability that, had the court given the instructions, a determination more favorable to Solis would have resulted. Solis did not receive ineffective assistance of counsel.

## II. The Court Did Not Prejudicially Err by Instructing the Jury with CALCRIM No. 3471

Solis argues the trial court erred by instructing the jury with CALCRIM No. 3471, which concerns the availability of self-defense where there is mutual combat or the defendant is the initial aggressor. We find no reversible error.

### A. Background

The prosecutor requested the trial court instruct the jury with CALCRIM No. 3471, to which Solis objected. The court asked if there was evidence of mutual combat, and the prosecutor responded that she intended to argue only that Solis was the initial aggressor. The trial court overruled Solis's objection and instructed the jury as follows:

> "A person who engages in mutual combat or who starts a fight has a right to self-defense only if:
> 1. He actually and in good faith tried to stop fighting; AND

12

2. He indicated, by word or by conduct, to his opponent in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;
AND

3. He gave his opponent a chance to stop fighting.

If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting.

A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

**B. Relevant Law**

"A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof." (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.) As a corollary to this rule, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) The reason is that extraneous instructions may confuse or mislead the jury. (*People v. Jackson* (1954) 42 Cal.2d 540, 546–547.)

13

We independently review whether there was substantial evidence to support a jury instruction. (*People v. Cole, supra,* 33 Cal.4th at p. 1206.)

### C. Analysis

Solis contends the court erred by instructing the jury with CALCRIM No. 3471 because there was no evidence of mutual combat, nor was there evidence showing he was the initial aggressor. We consider his mutual combat and initial aggressor arguments separately.

### 1. Mutual Combat

Solis first contends there was no evidence showing he and Rodriguez engaged in mutual combat.[3] The Attorney General implicitly concedes the point, and we agree with Solis. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1044 [mutual combat requires a preexisting mutual intention to engage in hostilities].) Nonetheless, we find the error harmless.

When the court gives an instruction that correctly states a principle of law, but has no application to the facts of the case, reversal is required only if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred.[4] (*People v. Guiton, supra,* 4 Cal.4th at pp. 1129–

---

[3]  We reject the Attorney General's suggestion that Solis forfeited this issue by failing to request the court modify the instruction to delete any reference to mutual combat. Solis objected to the entire instruction, which was sufficient to preserve the issue for appeal.

[4]  We reject Solis's arguments that the error was of "constitutional dimensions" because it diminished the requirement of proof beyond a reasonable doubt, violated his

14

1130.)  Prejudice is not assumed, but must be affirmatively demonstrated.  (*Id*. at p. 1129.)

Here, it is not reasonably probable the jury erroneously applied the mutual combat language or was confused by it. In requesting the CALCRIM No. 3471 instruction, the prosecutor represented that she intended to argue only that Solis was the initial aggressor.  Consistent with this representation, the prosecution did not refer to mutual combat at any point during closing arguments.  The instruction, moreover, clearly defined the concept, so there was little risk the jury would apply it using a lay definition or understanding.  (*Cf. People v. Ross* (2007) 155 Cal.App.4th 1033, 1054 [mutual combat instruction was prejudicial error where the term was not defined for the jury].) The court also instructed the jurors that some of its instructions might not be applicable, depending on their factual findings. We presume the jurors followed the court's instruction. (See *People v. Frandsen* (2011) 196 Cal.App.4th 266, 278 ["the jury is presumed to disregard an instruction if the jury finds the evidence does not support its application"].)  Under these circumstances, it is not reasonably probable the result would have been more favorable to Solis had the court not instructed the jury on mutual combat.

### 2. Initial Aggressor

Solis argues the trial court erred by instructing the jury with the initial aggressor language in CALCRIM No. 3471. He acknowledges there is evidence showing he pursued and pointed a firearm at Rodriguez prior to the shooting.  He insists, however, his actions were lawful because he was acting as a law

right to a fair trial, and deprived him of a meaningful opportunity to present a complete defense.  The error did no such things.

15

enforcement officer and attempting to arrest Rodriguez for an earlier robbery and assault.

Contrary to Solis's suggestions, the jury was not compelled to find he was attempting to arrest Rodriguez as a law enforcement officer. Even assuming Solis was robbed and assaulted in the manner he described (which is far from clear), it defies rational explanation why he would then single-handedly pursue and attempt to arrest two men he knew to be armed and dangerous, rather than reporting the crimes to the police and requesting backup. Just as perplexing was his decision to retrieve only a single pair of handcuffs and arm himself with a five-shot revolver, rather than his service weapon that was loaded with a 17-round magazine. That Solis was acting as a law enforcement officer was further contradicted by testimony from multiple witnesses who observed him shove and argue with Rodriguez before the shooting. It was also undisputed that Solis subsequently fled to Mexico, hid evidence, and tried to dissuade a witness from cooperating with police. In light of this evidence, the jury could have reasonably rejected Solis's testimony that he was attempting to arrest Rodriguez, and instead concluded he confronted Rodriguez for some other, unlawful purpose.

Solis alternatively suggests the court should not have given the initial aggressor instruction because it was inconsistent with the parties' factual theories of the case. According to Solis, the jury must have either concluded he targeted Rodriguez for murder, as the prosecution claimed, or that he acted in self-defense after lawfully attempting to arrest Rodriguez, as he claimed. Solis contends this leaves no room for a finding that he would have been entitled to self-defense but for the fact that he was the initial aggressor.

16

In making this argument, Solis overlooks that the jurors were not required to wholly accept or reject either party's factual theory of the case; they were free to take bits and pieces from each, or concoct an entirely new theory so long as it found sufficient support in the evidence and instructions. In fact, during deliberations, the jury asked the court to clarify this precise issue. Based on the evidence presented at trial, the jurors could have reasonably concluded Solis lied about attempting to lawfully arrest Rodriguez, yet told the truth about Rodriguez tackling him and attempting to stomp his head. If so, whether Solis was the initial aggressor was a key issue for the jury to decide. In light of this possibility, the court properly instructed the jury with the initial aggressor portion of CALCRIM No. 3471.

## III. The Court Properly Instructed the Jury with CALCRIM No. 3472

Solis argues the trial court erred by instructing the jury with CALCRIM No. 3472 as follows: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force."[5]

Solis contends this instruction was superfluous because there is no evidence showing he provoked a fight or quarrel with Rodriguez. Not so. Multiple witnesses testified that Solis pursued Rodriguez, argued with him, repeatedly pushed him, and

---

[5] We agree with the Attorney General that Solis forfeited this issue by failing to object to the instruction in the trial court. (*People v. Frandsen, supra,* 196 Cal.App.4th at p. 278 [defendant forfeited argument that CALCRIM No. 3472 instruction was not supported by substantial evidence by failing to object in trial court].) Nonetheless, we will consider the merits of his argument in order to forestall his derivative ineffective assistance of counsel claim.

pointed a firearm at him. From this, a reasonable juror could conclude Solis provoked a fight with Rodriguez with the intent to create an excuse to use force. (See *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334 [evidence that the defendant screamed, jabbed his finger repeatedly towards the victim's face, and threw kibble in her direction was sufficient to warrant CALCRIM No. 3472 instruction].)

Solis alternatively argues the instruction was unwarranted given he was acting as a law enforcement officer, and the parties' factual theories of the case left no room for a finding that he was not entitled to self-defense. These are essentially the same arguments Solis raised in connection with the initial aggressor language in CALCRIM No. 3471, and we reject them for the same reasons discussed above.

## IV. The Prosecutor Did Not Engage In Misconduct

Solis contends the prosecutor engaged in misconduct by trivializing the protections afforded to criminal defendants, improperly playing on the jurors' sympathies for Rodriguez, and shifting the burden of proof.[6] Specifically, he complains about the following remarks the prosecutor made during closing argument:

> "Did [Solis] keep that rule of law in mind? At the end of the day, what did he do to Mr. Rodriguez? Accused him of a

---

[6] We agree with the Attorney General that Solis forfeited his prosecutorial misconduct claims by failing to object at trial. (See *People v. Tully* (2012) 54 Cal.4th 952, 1037–1038 ["Ordinarily, the failure to object specifically on grounds of misconduct and to seek an admonition forfeits the claim unless an admonition would not have cured the harm."].) Nonetheless, we will consider the merits of his arguments to forestall his derivative ineffective assistance of counsel claim.

18

crime.  'I can't believe you would.'  Followed him relentlessly, pursued him, and shot him dead. "[Solis] robbed the system of [the] presumption [of innocence] that we have given to him since January 6th. He robbed Mr. Rodriguez of that presumption that Mr. Rodriguez was entitled to as one of us, as a citizen of this country.  If you genuinely, genuinely in your heart believe that this man assaulted you, that this man robbed you, that this man sodomized you, your job was to put it in before [] a jury.

"[¶] . . . [¶]

"But you know what we . . . have given [Solis] for the last week since we started this trial?  We gave him a process. . . .  [¶]  We gave him a fair trial.  And after this [court reporter] has typed every single word we've spoken and after this judge has ruled on every objection, we hand it over to you.  That's our system of justice. . . .  We give him what we gave him in this case, what he never gave Rodriguez, we give him a process and a fair trial.  [¶]  I ask you to do what is right by this evidence.  Do justice by this evidence . . . and find the defendant guilty of murder . . . in the first degree."

When a claim of misconduct is based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' "  (*People v. Smithey* (1999) 20 Cal.4th 936, 960.)  We will not " ' "lightly infer" that the jury drew the most damaging rather than the least

damaging meaning from the prosecutor's statements. [Citation.]' " (*People v. Wilson* (2005) 36 Cal.4th 309, 337–338.)

Here, it is not reasonably probable the jurors understood the prosecutor's comments in the manner Solis suggests. The prosecutor made the remarks while arguing there was no justification for Solis shooting and killing Rodriguez. In that context, it is clear the prosecutor intended to convey that, even if Solis were the victim of a crime, he was nonetheless an overzealous vigilante who unlawfully took justice into his own hands. This was a fair comment on the evidence and well within the wide latitude given to prosecutors during closing argument. (See *People v. Harrison* (2005) 35 Cal.4th 208, 244 ["The [prosecutor's] argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom."].) There is no significant risk the jurors construed or applied the comments in some other, objectionable manner.

Solis's reliance on *United States v. Mikhel* (9th Cir. 2018) 889 F.3d 1003 (*Mikhel*), *United States v. Mitchell* (9th Cir. 2007) 502 F.3d 931 (*Mitchell*), and *Kirkpatrick v. Blackburn* (5th Cir. 1985) 777 F.2d 272 (*Kirkpatrick*), is misplaced. In those cases, the prosecutors made remarks similar to the ones the prosecutor made here, but they did so while arguing for the imposition of the death penalty. (See *Mikhel*, at pp. 1055–1056; *Mitchell*, at p. 995; *Kirkpatrick*, at p. 283.) In that context, the comments were wholly irrelevant to the issues before the juries, and the only reasonable interpretations of them were improper. Here, the prosecutor's remarks were a fair comment on the evidence concerning a key issue in the case: whether Solis was acting as a law enforcement officer when he pursued and shot Rodriguez.

20

Given this distinction, *Mikhel*, *Mitchell*, and *Blackburn* are of no help to Solis.

**V.    Solis Has Not Shown His Counsel Provided Ineffective Assistance By Failing to Object to the Fines and Fees**

Solis contends his counsel provided ineffective assistance by failing to object to the court's imposition of a $300 restitution fine (§ 1202.4), a stayed $300 parole revocation fine (§ 1202.45), a $40 court operations assessment (§ 1465.8), and a $30 criminal conviction assessment (Gov. Code, § 70373). According to Solis, his counsel should have requested the court first determine whether he had the ability to pay the fines and fees. We disagree.

To prevail on a claim of ineffective assistance of counsel, a defendant must establish two elements: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors or omissions, a determination more favorable to the defendant would have resulted. (*Strickland v. Washington, supra*, 466 U.S. at pp. 690, 694; see *People v. Holt, supra*, 15 Cal.4th at p. 703.) If the record fails to disclose why trial counsel acted or failed to act in the manner challenged, the ineffective assistance of counsel claim must be rejected unless counsel was asked for, and failed to provide, an explanation or there could be no plausible explanation. (*People v. Pope* (1979) 23 Cal.3d 412, 426, overruled on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)

Here, the record does not disclose why counsel declined to object to the fines and fees, and counsel was not asked to provide an explanation. Moreover, we can conceive at least one plausible

21

explanation for counsel's failure to object:  he was aware that Solis had the ability to pay the relatively modest fines and fees. Solis, after all, had retained private counsel to represent him at the lengthy trial and sentencing.  Because we can conceive a plausible explanation for counsel's failure to object, we reject Solis's claim that he received ineffective assistance of counsel.

## DISPOSITION

The judgment is affirmed.

OHTA, J.*

We concur:

GRIMES, Acting P. J.

STRATTON, J.

---

*	Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22